No. 14-1825

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **MOTION FOR** |
| | : | **SUMMARY DISMISSAL** |
| v. | : | **AND STAY OF BRIEFING** |
| | : | **BASED ON DEFENDANT'S** |
| DANIEL JENKINS, | : | **WAIVER OF APPEAL** |
| Appellant | : | |

Marcia M. Waldron, Clerk          Michael V. Gilberti, Esq.
United States Court of Appeals     gilberti@ecg-law.com
 for the Third Circuit

Dear Ms. Waldron and Counsel:

Defendant, in return for charging and sentencing concessions from the United States, agreed that he would not appeal his sentence if he received a sentence within or below the Guideline Range resulting from a specified offense level.   Defendant did receive such a sentence.   Defendant has nonetheless filed a *pro se* appeal in direct contradiction of his plea agreement.   Accordingly, the United States moves, pursuant to 3d Cir. L.A.R. 27.4, for summary dismissal of this appeal prior to briefing.   The United States also moves, pending decision of its motion for summary dismissal, to stay the issuance of a briefing schedule in this appeal.

## A.    **DEFENDANT AGREED NOT TO APPEAL**

Defendant entered into a Plea Agreement with the United States. Ex. A. In that Plea Agreement, the United States agreed to move to dismiss counts two through nine of the Indictment pending against Daniel Jenkins, and to not initiate any further criminal charges against Daniel Jenkins for knowingly and intentionally conspiring and agreeing with others to distribute and possess with intent to distribute 10 grams or more of phencyclidine and a quantity of heroin from on or about May 31, 2012, through on or about September 13, 2012, in the District of New Jersey. Id. at 1. The United States also agreed to a number of sentencing concessions, including an agreement to not seek a sentence outside the Guidelines range, an agreement for a reduction for acceptance of responsibility, and a further one-point reduction for a timely acceptance of responsibility. Id. at 7 ¶ 1, 8 ¶ 9. In return for these concessions, Defendant "waive[d] certain rights to file an appeal, collateral attack, writ or motion after sentencing, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255." Id. at 4. Specifically, Defendant stipulated and agreed as follows:

> Daniel Jenkins knows that he has and, except as noted below in this paragraph, voluntarily waives, the right to file any appeal, any collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255, which challenges the sentence imposed by the sentencing court if that sentence falls within or below the Guidelines range that results

2

from a total Guidelines offense level of 31. . . .   The provisions of this
paragraph are binding on the parties even if the Court employs a
Guidelines analysis different from that stipulated to herein.
Furthermore, if the sentencing court accepts a stipulation, both parties
waive the right to file an appeal, collateral attack, writ, or motion
claiming that the sentencing court erred in doing so.

Ex. A at 9 ¶ 12.[1]   The United States reciprocally agreed not to appeal the sentence.

Id.   Both parties reserved the right to "dismiss any appeal barred" by the Plea

Agreement.   Id., at ¶ 13.

Defendant attested that he had received the Plea Agreement from his attorney,

that he read it, and that he understood it fully.   Id. at 6.   He further attested that "I

hereby accept the terms and conditions set forth in this letter and acknowledge that it

constitutes the plea agreement between the parties."   Id. at 6.   The agreement also

acknowledged that "no additional promises, agreements, or conditions have been

made or will be made unless set forth in writing and signed by the parties." Id. at 5.

Defendant plead guilty plea before the Honorable William H. Walls, U.S.D.J.,

on October 29, 2013.   Ex. B.   During the guilty plea colloquy, the District Court

again informed Defendant of, and ensured that he understood, the terms of his plea

---

[1]   The only exception was that "[t]he parties reserve any right they may have
under 18 U.S.C. § 3742 to appeal the sentencing court's determination of the
criminal history category." Id.   At the sentencing hearing, Defendant conceded that
the calculation of his criminal history category was correct.   Exh. C at 9.

agreement provision waiving his right to appeal.   Ex. B at 23-25; see Fed. R. Crim.
P. 11(b)(1)(N).

At sentencing, the District Court found that Defendant's offense level was 31,
the same offense level that triggered Defendant's waiver of his right to appeal.   Ex.
C at 29.   The Guideline Range that resulted from that offense level, using
Defendant's criminal history category of VI, was 188 to 235 months.   U.S.S.G. Ch.
5, Pt. A.   The Court sentenced Defendant to 188 months' incarceration, the bottom
of the Guidelines range.   Id. at 37.   Accordingly, Defendant's sentence was within
"the Guidelines range that results from a total Guidelines offense level of 31."   Ex.
A at 9, ¶ 12.   Defendant had agreed not to appeal such a sentence. Id.   Nonetheless,
Defendant filed a *pro se* notice of appeal.

B.   **DEFENDANT'S APPEAL SHOULD BE SUMMARILY DISMISSED**

The United States respectfully requests that this Court summarily dismiss
Defendant's appeal, filed in derogation of his waiver of appeal.   This Court has long
and consistently enforced waivers of appeal in plea agreements.   E.g., United States
v. Khattak, 273 F.3d 557 (3d Cir. 2001).   This Court has also made clear that the
Government should file summary action motions to enforce such waivers.   United
States v. Goodson, 544 F.3d 529, 535 n.2 (3d Cir. 2008).

"Where, as here, the government invokes an appellate-waiver provision contained in a defendant's plea agreement, we must determine as a threshold matter whether the appellate waiver prevents us from exercising our jurisdiction to review the merits of the defendant's appeal." United States v. Corso, 549 F.3d 921, 926 (3d Cir. 2008).  This Court "will not review the District Court's application of the sentencing enhancements, or otherwise review his sentence for reasonableness, if he validly waived his right to that review." Id. at 928; United States v. Jackson, 523 F.3d 234, 242 (3d Cir. 2008); United States v. Gwinnett, 483 F.3d 200, 203 (3d Cir. 2007).

"'[P]lea agreements, although arising in the criminal context, are analyzed under contract law standards.'" Corso, 549 F.3d at 927 (citation omitted).

"[U]nder contract principles, a plea agreement necessarily 'works both ways.  Not only must the government comply with its terms and conditions, but so must the defendant.'"  Thus, we will not permit a defendant to "'get the benefits of his plea bargain, while evading the costs [because] contract law would not support such a result.'"

Id. (quoting United States v. Williams, 510 F.3d 416, 422 (3d Cir. 2007) (other citations omitted)).

Here, in return for Government charging and sentencing concessions, Defendant agreed not to appeal his sentence if it "falls within or below the Guidelines range that results from a total Guidelines offense level of 31." Ex. A at 9

5

¶ 12.  If it did, Defendant agreed not "to file any appeal . . ., including but not limited to an appeal under 18 U.S.C. § 3742 . . ., which challenges the sentence imposed by the sentencing court."  <u>Id.</u>

The language of Defendant's "appellate waiver is broad in scope and clear." <u>Corso</u>, 549 F.3d at 927; <u>Gwinnett</u>, 483 F.3d at 203-05.  Defendant's appellate waiver is "undoubtedly comprehensive," <u>United States v. Price</u>, 558 F.3d 270, 284 (3d Cir. 2009), because it bars "any appeal relying upon § 3742" and any appeal of "any ... component of punishment" included in the sentence.  <u>Goodson</u>, 544 F.3d at 537-38 (similar language bars appeal of the conditions of supervised release); <u>Jackson</u>, 523 F.3d at 244 (same for length of supervised release); <u>United States v. Perez</u>, 514 F.3d 296, 298-99 (3d Cir.  2007) (identical language bars appeal of restitution order).[2]

"'To avoid dismissal of appeal, Defendant must show why we should not enforce the waiver provision of the plea agreement.'"  <u>Khattak</u>, 273 F.3d at 563 (citation omitted).  This Court will enforce the waiver of appeal unless Defendant

---

[2]  <u>Accord</u>, <u>e.g.</u>, <u>United States v. Paige</u>, 340 Fed. Appx. 804 (3d Cir. 2009) (not precedential) (identical language bars appeal of consecutive nature of sentence); <u>United States v. Cassese</u>, 337 Fed. Appx. 201(3d Cir. 2009) (not precedential) (defendant's appeal claiming that "the District Court committed procedural error in imposing his sentence" is "undoubtedly precluded by the plain language of the amendment to the plea agreement").

shows that it was not "entered into knowingly and voluntarily" or that it would "work a miscarriage of justice." Id. Defendant cannot make either showing here.

"[D]efendant bears the burden of presenting an argument that would render his waiver unknowing or involuntary." United States v. Mabry, 536 F.3d 231, 237 (3d Cir. 2008) (collateral-attack waiver). Here, Defendant's attestation when he signed the Plea Agreement, his consultation with counsel, and his colloquy at the guilty plea hearing, demonstrate that his waiver was knowing and voluntary. See id. at 238-39; Price, 558 F.3d at 284; Jackson, 523 F.3d at 243; Gwinnett, 483 F.3d at 204-05; Khattak, 273 F.3d at 561.

Defendant also bears the burden of showing a miscarriage of justice. That exception must "'be applied sparingly and without undue generosity.'" United States v. Wilson, 429 F.3d 455, 458-60 (3d Cir. 2005) (quoting United States v. Teeter, 257 F.3d 14, 26 (1st Cir. 2001)); see Khattak, 273 F.3d at 562 (exception may apply only in "an unusual circumstance"); Jackson, 523 F.3d at 244 (exception applies only in "a rare and unusual situation"). "The waiver of an appeal will not be invalidated merely because unanticipated events occur in the future." United States v. Lockett, 406 F.3d 207, 213-14 (3d Cir. 2005). Similarly, "subsequent changes in the law do not undercut the validity of an appellate waiver." Id. Furthermore, a waiver of appeal will not be invalidated merely because it waives "difficult or

7

debatable legal issues – indeed, it includes a waiver of the right to appeal blatant error.'" <u>Khattak</u>, 272 F.3d at 562; <u>Corso</u>, 549 F.3d at 931 ("'allow[ing] alleged errors in computing a defendant's sentence to render a waiver unlawful would nullify the waiver based on the very sort of claim it was intended to waive'"); <u>e.g.</u>, <u>Lockett</u>, 406 F.3d at 212-14. No "manifest injustice" would result by enforcing the appellate waiver here. <u>Gwinnett</u>, 483 F.3d at 206.

Indeed, "[e]nforcing the waiver is in line with justice, not a miscarriage of it." <u>Mabry</u>, 536 F.3d at 244. "Allowing defendants to retract waivers would prolong litigation, affording defendants the benefits of their agreements while shielding them from their self-imposed burdens." <u>Khattak</u>, 273 F.3d at 561. Enforcing the waiver properly prevents Defendant from "'reneg[ing] on his agreement,'" and properly holds Defendant to the Plea Agreement when "'he seeks the benefits of it without the burdens.'" <u>Williams</u>, 510 F.3d at 422 (citations omitted). Furthermore, enforcing waivers of appeal "'preserve[s] the finality of judgments and sentences imposed pursuant to valid pleas of guilty,'" protects judicial and prosecutorial resources, and ultimately "may assist defendants in making favorable plea bargains." <u>Khattak</u>, 273 F.3d at 561-62 (citation omitted). Accordingly, this Court should "enforce the waiver" and summarily "dismiss the appeal," <u>Goodson</u>, 544 F.3d at 533 n.1, 535 & n.2.

## C.    BRIEFING SHOULD BE STAYED PENDING DISMISSAL

Pending decision on the motion to dismiss, the United States respectfully requests that this Court stay the issuance of a briefing schedule. This Court has stressed that waivers of appeal should be enforced by summary action prior to briefing:

> To obtain the full benefit of its bargain, we emphasize that the government may file a motion for summary action under Third Circuit L.A.R. 27.4 to enforce the waiver and to dismiss the appeal. The defendant may then submit argument in opposition. See Third Circuit I.O.P. 10.6. A motions panel will then rule on the enforceability of the waiver. This approach is beneficial to the government because briefing at this stage is limited to the validity and scope of the waiver.

United States v. Goodson, 544 F.3d 529, 535 n.2 (3d Cir. 2008) (citing United States v. Hahn, 359 F.3d 1315, 1328 (10th Cir. 2004) (en banc)).

Deciding such summary action motions before briefing is important because "appellate waivers benefit the government by saving the costs of prosecuting appeals; and '[o]nly through the [efficient] dismissal of [an] appeal will the government receive the benefit of its bargain.'" Hahn, 359 F.3d at 1325, 1328 (citation omitted) (referring the motion to the merits panel "robs [the government] of the benefit of its bargain"). "Requiring the government to file an appeal brief even though there is an appeal waiver substantially diminishes the value of the waiver to the government, and by extension to defendants who are willing to

9

bargain away their right to appeal the sentence."  United States v. Bascomb, 451

F.3d 1292, 1294 (11th Cir. 2006); see United States v. Yemitan, 70 F.3d 746, 748

(2d Cir. 1995).

Staying briefing, and deciding such summary action motions before briefing,

is important because it saves the resources of this Court which would be wasted by

pointless briefing.   It also prevents this Court's docket from being cluttered with

appeals that defendants agreed would never be brought.

## CONCLUSION

Accordingly, the United States respectfully requests that this Court enforce

the appellate waiver and summarily dismiss the appeal.   Pending decision on the

motion to dismiss, the United States respectfully requests that this Court stay the

issuance of a briefing schedule.

Respectfully submitted,
PAUL J. FISHMAN
United States Attorney

By:    GLENN J. MORAMARCO
Assistant U.S. Attorney

September 10, 2014

10

## CERTIFICATION OF SERVICE

I hereby certify that I caused a copy of the attached motion to be served September 10, 2014, by the Notice of Docketing Activity generated by the Third Circuit's electronic filing system, on the following Filing User:

Michael V. Gilberti, Esquire
gilberti@ecg-law.com

/s Glenn J. Moramarco
Assistant U.S. Attorney

Dated: September 10, 2014

11

# EXHIBIT A



**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

---

970 Broad Street, 7ᵗʰ floor                                     973-645-2700
Newark, New Jersey 07102

October 3, 2013

Michael Gilberti, Esq.
Epstein, Cohen & Gilberti, LLC
21 East Front Street- Suite 210
Red Bank, New Jersey 07701

       Re:  Plea Agreement with Daniel Jenkins, a/k/a "OD"

Dear Mr. Gilberti:                                    13-646(WHW)

       .       This letter sets forth the plea agreement between your
client, Daniel Jenkins, a/k/a "OD," and the United States
Attorney for the District of New Jersey ("this Office").

**Charge**

              Conditioned on the understandings specified below,
this Office will accept a guilty plea from Daniel Jenkins to
Count One of the Indictment, Criminal No. 13-646. Count One
charges Daniel Jenkins with conspiracy to distribute and possess
with intent to distribute 10 grams or more of phencyclidine
(PCP) contrary to Title 21, United States Code, Sections 841(a)
and 841(b)(1)(B), and a quantity of heroin, contrary to of Title
21, United States Code Section 841(a) and 841(b)(1)(C), all in
violation of Title 21, United States Code, Section 846.  If
Daniel Jenkins enters a guilty plea and is sentenced on these
charges, and otherwise fully complies with all of the terms of
this agreement, this Office will not initiate any further
criminal charges against Daniel Jenkins for knowingly and
intentionally conspiring and agreeing with others to distribute
and possess with intent to distribute 10 grams or more of
phencyclidine and a quantity of heroin from on or about May 31,
2012 through on or about September 13, 2012, in the District of
New Jersey.  In addition, if Daniel Jenkins complies with all of
the terms of this agreement, at the time of sentencing in this
matter, this Office will move to dismiss counts two through nine
of the Indictment, Crim. No. 13-646, against defendant Daniel

Jenkins. However, in the event that a guilty plea in this matter is not entered for any reason or the judgment of conviction entered as a result of this guilty plea does not remain in full force and effect, Daniel Jenkins agrees that any dismissed charges and any other charges that are not time-barred by the applicable statute of limitations on the date this agreement is signed by Daniel Jenkins may be commenced against him, notwithstanding the expiration of the limitations period after Daniel Jenkins signs the agreement.

## Sentencing

The violation of 21 U.S.C. § 846 (contrary to 21 U.S.C. §§ 841(a) and 841(b)(1)(B) and 841(b)(1)(C)), which is Count One of the Indictment to which Daniel Jenkins agrees to plead guilty, carries a statutory minimum prison sentence of five (5) years and a statutory maximum prison sentence of forty (40) years and a statutory maximum fine equal to the greatest of: (1) $5,000,000.00 or (2) twice the gross profits or other proceeds to Daniel Jenkins. All fines imposed by the sentencing judge may be subject to the payment of interest.

The sentence to be imposed upon Daniel Jenkins is within the sole discretion of the sentencing judge, subject to the provisions of the Sentencing Reform Act, 18 U.S.C. § 3551-3742, and the sentencing judge's consideration of the United States Sentencing Guidelines. The United States Sentencing Guidelines are advisory, not mandatory. The sentencing judge may impose any reasonable sentence up to and including the statutory maximum term of imprisonment and the maximum statutory fine. This Office cannot and does not make any representation or promise as to what guideline range may be found by the sentencing judge, or as to what sentence Daniel Jenkins ultimately will receive.

Further, with respect to count one, in addition to imposing any other penalty on Daniel Jenkins, the sentencing judge: (1) will order Daniel Jenkins to pay an assessment of $100 pursuant to 18 U.S.C. § 3013, which assessment must be paid by the date of sentencing; (2) may order Daniel Jenkins to pay restitution pursuant to 18 U.S.C. § 3663 et seq. (3) must order forfeiture, pursuant to 21 U.S.C. § 853; (4) may deny Daniel Jenkins certain statutorily defined benefits, pursuant to 21 U.S.C. § 862 and 862a; and (5) pursuant to 21 U.S.C. § 841 must require Daniel Jenkins to serve a term of supervised

- 2 -

release of at least 4 years, which will begin at the expiration
of any term of imprisonment imposed.  Should Daniel Jenkins be
placed on a term of supervised release and subsequently violate
any of the conditions of supervised release before the
expiration of its term, Daniel Jenkins may be sentenced to not
more than 3 years' imprisonment in addition to any prison term
previously imposed, regardless of the statutory maximum term of
imprisonment set forth above and without credit for time
previously served on post-release supervision, and may be
sentenced to an additional term of supervised release.

### Rights of This Office Regarding Sentencing

Except as otherwise provided in this agreement, this
Office reserves its right to take any position with respect to
the appropriate sentence to be imposed on Daniel Jenkins by the
sentencing judge, to correct any misstatements relating to the
sentencing proceedings, and to provide the sentencing judge and
the United States Probation Office all law and information
relevant to sentencing, favorable or otherwise.  In addition,
this Office may inform the sentencing judge and the United
States Probation Office of:  (1) this agreement; and (2) the
full nature and extent of Daniel Jenkins' activities and
relevant conduct with respect to this case.

### Stipulations

This Office and Daniel Jenkins agree to stipulate at
sentencing to the statements set forth in the attached Schedule
A, which hereby is made a part of this plea agreement.  This
agreement to stipulate, however, cannot and does not bind the
sentencing judge, who may make independent factual findings and
may reject any or all of the stipulations entered into by the
parties.  To the extent that the parties do not stipulate to a
particular fact or legal conclusion, each reserves the right to
argue the existence of and the effect of any such fact or
conclusion upon the sentence.  Moreover, this agreement to
stipulate on the part of this Office is based on the information
and evidence that this Office possesses as of the date of this
agreement.  Thus, if this Office obtains or receives additional
evidence or information prior to sentencing that it determines
to be credible and to be materially in conflict with any
stipulation in the attached Schedule A, this Office shall not be
bound by any such stipulation.  A determination that any

- 3 -

stipulation is not binding shall not release either this Office
or Daniel Jenkins from any other portion of this agreement,
including any other stipulation.  If the sentencing court
rejects a stipulation, both parties reserve the right to argue
on appeal or at post-sentencing proceedings that the sentencing
court was within its discretion and authority to do so.  These
stipulations do not restrict the Government's right to respond
to questions from the Court and to correct misinformation that
has been provided to the Court.

## Waiver of Appeal and Post-Sentencing Rights

As set forth in Schedule A, this Office and Daniel
Jenkins waive certain rights to file an appeal, collateral
attack, writ, or motion after sentencing, including but not
limited to an appeal under 18 U.S.C. § 3742 or a motion under 28
U.S.C. § 2255.

## Immigration Consequences

Daniel Jenkins understands that, if he is not a
citizen of the United States, his guilty plea to the charged
offenses will likely result in him being subject to immigration
proceedings and removed from the United States by making him
deportable, excludable, or inadmissible, or ending her
naturalization.  Daniel Jenkins understands that the immigration
consequences of this plea will be imposed in a separate
proceeding before the immigration authorities.  Daniel Jenkins
wants and agrees to plead guilty to the charged offenses
regardless of any immigration consequences of this plea, even if
this plea will cause his removal from the United States.  Daniel
Jenkins understands that he is bound by his guilty plea
regardless of any immigration consequences of the plea.
Accordingly, Daniel Jenkins waives any and all challenges to his
guilty plea and to his sentence based on any immigration
consequences, and agrees not to seek to withdraw his guilty
plea, or to file a direct appeal or any kind of collateral
attack challenging his guilty plea, conviction, or sentence,
based on any immigration consequences of his guilty plea.

- 4 -

**Other Provisions**

This agreement is limited to the United States Attorney's Office for the District of New Jersey and cannot bind other federal, state, or local authorities. However, this Office will bring this agreement to the attention of other prosecuting offices, if requested to do so.

This agreement was reached without regard to any civil or administrative matters that may be pending or commenced in the future against Daniel Jenkins. This agreement does not prohibit the United States, any agency thereof including the Internal Revenue Service, Immigration and Customs Enforcement or any third party from initiating or prosecuting any civil or administrative proceeding against Daniel Jenkins.

**No Other Promises**

This agreement constitutes the plea agreement between Daniel Jenkins and this Office and supersedes any previous agreements between them. No additional promises, agreements, or conditions have been made or will be made unless set forth in writing and signed by the parties.

Very truly yours,

PAUL J. FISHMAN
United States Attorney

By: José R. Almonte
Assistant U.S. Attorney

APPROVED:

Ronnell L. Wilson
Chief, Narcotics/OCDETF

- 5 -

I have received this letter from my attorney, Michael Gilberti, Esq., and I have read it. My attorney and I have discussed it and all of its provisions, including those addressing the charges, sentencing, stipulations, waiver, and immigration consequences. I understand this letter fully. I hereby accept its terms and conditions and acknowledge that it constitutes the plea agreement between the parties. I understand that no additional promises, agreements, or conditions have been made or will be made unless set forth in writing and signed by the parties. I want to plead guilty pursuant to this plea agreement.

AGREED AND ACCEPTED:

Daniel Jenkins                    Date:  _10. 4. 13_


I have discussed with my client this plea agreement and all of its provisions, including those addressing the charges, sentencing, stipulations, waiver, immigration consequences. My client understands this plea agreement fully and wants to plead guilty pursuant to it.

Michael Gilberti, Esq.            Date: _10. 4. 13_

- 6 -

Plea Agreement With Daniel Jenkins

Schedule A

1.    This Office and Daniel Jenkins recognize that the
United States Sentencing Guidelines are not binding upon the
Court.   This Office and Daniel Jenkins nevertheless agree to the
stipulations set forth herein, and agree that the Court should
sentence Daniel Jenkins within the Guidelines range that results
from the total Guidelines offense level set forth below.   This
Office and Daniel Jenkins further agree that neither party will
argue for the imposition of a sentence outside the Guidelines
range that results from the agreed total Guidelines offense
level.

2.    The version of the United States Sentencing
Guidelines effective November 1, 2012 applies in this case.

3.    Because the offense involved two different
controlled substances, phencyclidine ("PCP") (actual) and
heroin, the quantities of the substance involved in this case
must be added together after they have been converted to
marihuana. See U.S.S.G. § 2D1.1(c), Comment n.8(B).

4.    The offense involved approximately 11.18 grams of
PCP.   Pursuant to the Drug Equivalency Table, 1 gram of PCP
(actual) is equivalent to 10 kilograms of marihuana.   See
U.S.S.G. § 2D1.1(c), Comment n.8(D).   Therefore, 11.18 grams of
PCP is equivalent to 111.8 kilograms of marihuana.

5.    The offense also involved approximately 87.3 grams
of heroin.   Pursuant to the Drug Equivalency Table, 1 gram of
heroin is equivalent to 1 kilogram of marihuana.   See U.S.S.G. §
2D1.1(c), Comment n.8(D).   Therefore, 87.3 grams of heroin is
equivalent to 87.3 kilograms of marihuana.

6.    The combined quantity PCP and heroin charged in
Count One of the Indictment equates to 199.1 kilograms of
marihuana. Because the combined quantity of the controlled
substances is more than 100 kilograms but less than 400
kilograms of marihuana, the base offense level is 26. See
U.S.S.G. § 2D1.1(c)(7).

**Career Offender**

7. If Daniel Jenkins is determined to be a Career Offender, pursuant to U.S.S.G. § 4B1.1, due to having sustained at least two prior felony convictions for crimes of violence or controlled substance offenses, the base Offense Level for the instant offense will be 34, and Daniel Jenkins' criminal history will be category VI. Daniel Jenkins reserves the right to argue at sentencing that he is not a Career Offender, and the government reserves the right to argue that he is a Career Offender.

**Total Offense Level and Waiver of Rights**

8. As of the date of this letter, Daniel Jenkins has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for the offenses charged. Therefore, a downward adjustment of 2 levels for acceptance of responsibility is appropriate if Daniel Jenkins' acceptance of responsibility continues through the date of sentencing. See U.S.S.G. § 3E1.1(a).

9. As of the date of this letter, Daniel Jenkins has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently. If Daniel Jenkins enters a plea pursuant to this agreement and qualifies for a 2-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), and if in addition Daniel Jenkins' offense level under the Guidelines prior to the operation of § 3E1.1(a) is 16 or greater, Daniel Jenkins will be entitled to a further 1-point reduction in his offense level pursuant to U.S.S.G. § 3E1.1(b).

10. In accordance with the above, the parties agree that: (a) if the Court finds that Daniel Jenkins is a Career Offender pursuant to U.S.S.G. § 4B1.1, the total Guidelines offense level applicable to Daniel Jenkins is 31; and (b) otherwise the total Guidelines offense level applicable to Daniel Jenkins will be 23 (collectively, the "agreed total Guidelines offense level").

- 8 -

11. The parties agree not to seek or argue for any upward or downward departure, adjustment or variance not set forth herein. The parties further agree that a sentence within the Guidelines range that results from the agreed total Guidelines offense level is reasonable.

12. Daniel Jenkins knows that he has and, except as noted below in this paragraph, voluntarily waives, the right to file any appeal, any collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255, which challenges the sentence imposed by the sentencing court if that sentence falls within or below the Guidelines range that results from a total Guidelines offense level of 31. This Office will not file any appeal, motion or writ which challenges the sentence imposed by the sentencing court if that sentence falls within or above the Guidelines range that results from a total Guidelines offense level of 23. The parties reserve any right they may have under 18 U.S.C. § 3742 to appeal the sentencing court's determination of the criminal history category. The provisions of this paragraph are binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, if the sentencing court accepts a stipulation, both parties waive the right to file an appeal, collateral attack, writ, or motion claiming that the sentencing court erred in doing so.

13. Both parties reserve the right to oppose or move to dismiss any appeal, collateral attack, writ, or motion barred by the preceding paragraph and to file or to oppose any appeal, collateral attack, writ or motion not barred by the preceding paragraph.

# EXHIBIT B

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF NEW JERSEY
 2                      Criminal No. 2:13-cr-00646-WHW-1

 3

 4
        UNITED STATES OF AMERICA,   :
 5                                   :    TRANSCRIPT OF PROCEEDINGS
                 v.                  :        - Plea Hearing -
 6                                   :
        DANIEL JENKINS, also         :
 7      known as "OD,"               :
                                     :
 8             Defendant.            :
        - - - - - - - - - - - - - -

 9

10                                   Newark, New Jersey
                                     October 29, 2013
11

12      B E F O R E:

13                      THE HONORABLE WILLIAM H. WALLS,
                        UNITED STATES DISTRICT JUDGE
14

15
        A P P E A R A N C E S:
16
            UNITED STATES ATTORNEY'S OFFICE
17          BY:   JOSE ALMONTE
                  Assistant U.S. Attorney
18          For the Government

19          MICHAEL V. GILBERTI, ESQ.
            For the Defendant
20

21      Pursuant to Section 753 Title 28 United States Code, the
        following transcript is certified to be an accurate record as
22      taken stenographically in the above entitled proceedings.

23
        S/WALTER J. PERELLI
24
        WALTER J. PERELLI, CCR, CRR
25      Official Court Reporter
```

1          THE COURT:  Good morning.

2          MR. GILBERTI:  Good morning, your Honor.

3          THE COURT:  Enter your appearances, please.

4          MR. ALMONTE:  Good morning, your Honor.  Assistant

5  United States Attorney Jose Almonte, on behalf of the

6  Government.  And also at counsel table is Special Agent Mark

7  Sulkin with DEA.

8          MR. GILBERTI:  Good morning, your Honor.  Michael

9  Gilberti on behalf of Defendant Daniel Jenkins, who is in court

10  with me.

11         THE COURT:  Now, there's a history to -- your client

12  is Mr. Jenkins?

13         MR. GILBERTI:  Yes, your Honor.

14         THE COURT:  There's a history to this and I just want

15  to make sure we have crossed all "t's" and dotted all "i's."

16         I understand your appearance before me today is for

17  purposes of arraignment, and right after that, an entry of a

18  plea.  Is that correct?

19         MR. GILBERTI:  That's correct, your Honor.

20         THE COURT:  I also understand that in February of this

21  year, particularly on February 20th, then Magistrate Judge

22  Shwartz had a hearing in which appeared Daniel Jenkins

23  and John Edwards, both of whom are subject to this indictment

24  in front of me.

25         MR. GILBERTI:  I believe Mr. Jenkins is the only

1    one --

2            THE COURT:  What?

3            MR. GILBERTI:  -- in the indictment, but I believe the

4    co-conspirator is Mr. Jenkins.  Mr. Edwards who is pleading --

5            THE COURT:  My point is that she said -- the

6    Magistrate Judge, now Circuit Judge -- she said that there was

7    a possibility of a conflict of attorneys because they each are

8    being represented by Mr. Gilberti.

9            MR. GILBERTI:  That's correct, your Honor.  And we had

10   a hearing --

11           THE COURT:  Let me finish and I'll give you time to --

12           MR. GILBERTI:  Yes, sir.

13           THE COURT:  -- give me your A-B-Cs, and even to Z.

14   All right?

15           MR. GILBERTI:  Yes, your Honor.

16           THE COURT:  And she took pains to discuss this with

17   these defendants informing them that, if necessary, each could

18   have independent counsel.  And as I understand it, each

19   defendant declined her offer.

20           Now, it is now October, practically November of 2013,

21   some nine, ten months after what Judge Shwartz had advised

22   these defendants.  So I think it's appropriate that I now take

23   time to ask Mr. Jenkins directly about this possible conflict.

24           MR. GILBERTI:  That's correct, your Honor.

25           THE COURT:  Would you have a seat.

```
1              Are you Daniel Jenkins?
2              THE DEFENDANT:  Yes, sir.
3              THE COURT:  Have you had any medication or drugs of
4    any kind in the last 48 hours?
5              THE DEFENDANT:  No, sir.
6              THE COURT:  Now, what I want you to do is -- Marshal,
7    bring him up to the lectern.
8                    EXAMINATION BY THE COURT:
9    Q    Tell me about yourself.  First of all, when and where were
10   you born?
11   A    Jersey City.
12   Q    When?
13   A    10/20/73.
14   Q    What year?
15   A    '73.
16   Q    And what's the birth date?  June?
17   A    10/20/73.
18   Q    Oh.  Oh, you mean October 20?
19   A    Yes.
20   Q    So you just had a birthday recently, didn't you?
21   A    Yes, sir.
22   Q    So the birthday makes you 40 years of age.  Is that
23   correct?
24   A    Yes, sir.
25   Q    Did you go to school in Jersey City?
```

```
 1    A    Yes, sir.

 2    Q    How far did you go?

 3    A    Tenth grade.

 4    Q    So that's sophomore in high school, isn't it?

 5    A    Yes, sir.

 6    Q    Can you read and write English?

 7    A    Yes.

 8    Q    All right.  Now, and what have you done, generally

 9    speaking, about earning a living legally?  Let me know.  What

10    have you done by way of work?

11    A    I was working at my family establishment.

12    Q    What is your family's establishment?

13    A    They own a beauty parlor.

14    Q    What?

15    A    A beauty parlor and a barber shop.

16    Q    I see.  Are you a barber?

17    A    No, sir.

18    Q    What do you do?

19    A    I just kept maintenance around.

20    Q    You just what?

21    A    Maintenance.

22    Q    All right.  Okay.  I only ask these questions to make sure

23    you have the requisite degree of maturity to appreciate why

24    you're here, that's why I'm asking you what you've done.

25            Now, you and your alleged co-conspirator have the same
```

1    lawyer.  Is that correct?

2    A    Yes.

3    Q    And you are supposedly before me today to plead guilty to

4    this charge of conspiring with other people to distribute and

5    possess with intent to distribute controlled dangerous

6    substances as set out in the Indictment 13-341.  Is that why

7    you're here today?

8    A    Yes.

9    Q    Now, before we proceed further, do you understand that you

10   as a criminal defendant in a case such as this are entitled to

11   have the benefit of advice and counsel given to you by a lawyer

12   who is only loyal to you?

13            Do you understand that?

14   A    Yes, sir.

15   Q    In other words, you're entitled to the benefit of a lawyer

16   who would put your interests first before the interest of

17   anybody else.

18   A    Yes.

19   Q    Including any co-defendant in this case.

20            Do you understand that?

21   A    Yes.

22   Q    And do you know that Mr. Gilberti also represents John

23   Edwards, who the Government alleges is a co-conspirator to this

24   crime?

25   A    Yes, sir.

1   Q    What?

2   A    Yes.

3   Q    And do you further understand that your interest might be

4   different from the interests of Mr. Edwards and anybody else

5   with regard to this case, and particularly with regard to the

6   sentencing?

7   A    Yes.

8   Q    You know that?

9   A    Yes.

10  Q    Now, do you understand that therefore the defenses that you

11  may have might conflict with any defenses that Edwards or

12  anybody else may have with regard to the defense of this case?

13  A    Yes.

14  Q    You know what I mean by "conflict"?  They might clash

15  against each other.  Do you understand that?

16  A    Yes.

17  Q    And if there is a conflict between what you are trying to

18  defend yourself with and what Edwards is trying to defend

19  himself with, or anybody else, Mr. Gilberti might not be able

20  to do -- defend you as well as you are entitled to.  You

21  understand that?

22  A    Yes.

23  Q    And if he continues to represent you, it might be difficult

24  for you to cooperate with the Government if you so wished to do

25  so.  Do you understand that?

WALTER J. PERELLI, C.S.R., OFFICIAL COURT REPORTER, NEWARK, NJ

1    A    Yes.

2    Q    Do you further understand that if you cooperate with the

3    Government, you may be able to receive a reduced sentence; that

4    is, a sentence below what you and the Government agreed is

5    reasonable under the terms of a plea bargain.

6            Do you understand that?

7    A    Yes.

8    Q    Now, whether you get it or not is not up to the Government,

9    it's up to the judge.

10           Do you understand that?

11   A    Yes.

12   Q    And do you also understand that having one attorney

13   representing you and your co-defendant, it may be unlikely that

14   you will be able to receive a benefit of cooperation; that is,

15   a reduced sentence?

16           Do you understand that?

17   A    Yes.

18   Q    Neither you nor your attorney, nor the Government, not even

19   the Court can foresee all the conflicts that my arise by the

20   fact that you and Edwards have the same attorney.

21           Do you know that?

22   A    Yes.

23   Q    And have you agreed -- or strike that -- have you discussed

24   with Mr. Gilberti the potential conflicts of interest in this

25   case?

1    A    Yes.

2    Q    And do you also know that you have a right to talk with and

3    consult with and get the advice from somebody else who is

4    different from Mr. Gilberti as a lawyer to determine whether

5    you should have Mr. Gilberti represent you?

6    A    Yes.

7    Q    You know all that?

8    A    Yes, sir.

9    Q    And do you realize, or do you know that I, just tell like

10   Judge Shwartz, I will give you an opportunity, if you wish such

11   an opportunity, to speak to another attorney about the

12   potential conflicts of interest or any concern you may have

13   about Mr. Gilberti continuing to represent you and Edwards

14   simultaneously.

15           Do you know that?

16   A    Yes.

17   Q    Do you wish that?

18   A    No, sir.

19   Q    You're sure?

20   A    Yes.

21   Q    Have you had enough time to think this matter over?

22   A    Yes.

23   Q    And you know what you're doing?

24   A    Yes, sir.

25   Q    Do you realize that even if you cannot afford to hire your

1   own attorney, that I will appoint an attorney to consult with

2   you about this conflict of interest?

3               Do you understand that?

4   A    Yes.

5   Q    Have you spoken to anybody else?  Have you ever spoken to

6   any other attorney about this conflict of interest?

7   A    No, sir.

8   Q    Do you want to speak to somebody else?  I mean, when I say

9   "somebody else," I mean another lawyer.

10  A    No, sir.

11  Q    You're sure?

12  A    Yes.

13  Q    And you've had enough time to consider this issue?

14  A    Yes.

15  Q    Are you satisfied with the way Mr. Gilberti has represented

16  you so far?

17  A    Yes.

18  Q    Do you still want to proceed with him as your attorney,

19  even though he represents Edwards as well?

20  A    Yes, sir.

21  Q    Now, do you understand you're giving up your right to have

22  legal representation free from any conflict of interest?  Do

23  you know that?

24  A    Yes.

25  Q    Has anyone promised you anything to have you take this

1    position?

2    A    No.

3    Q    Has anyone threatened you in any way to have you -- for you

4    to take this position?

5    A    No.

6    Q    So can I assume from that, that what you're doing and what

7    you're telling me you're doing is of your own free will?

8    A    Yes.

9    Q    Anyone put a gun to your head literally or figuratively to

10   make you do what you're now doing?

11   A    No.

12   Q    Anything that -- is there anything that I've said to you

13   this morning that you don't understand?

14   A    No.

15   Q    You're sure?

16   A    Yes.

17   Q    Okay.  So you're doing this on your own.  Right?

18   A    Yes, sir.

19   Q    And of your own free will?

20   A    Yes.

21   Q    All right.

22              THE COURT:  Now, has he been placed under oath?

23              THE DEPUTY CLERK:  No.

24              THE COURT:  Place him under oath.  I thought he had

25   been.

```
 1    D A N I E L   J E N K I N S, the Defendant, is duly sworn:
 2
 3              THE DEPUTY CLERK:  State your name, please, for the
 4    record.
 5              THE DEFENDANT:  Daniel Jenkins.
 6              EXAMINATION BY THE COURT CONTINUES:
 7    Q   As I've discussed with you, you're here, as I understand,
 8    because you wish to plead guilty to a charge that's found in
 9    the Indictment 13-341, and that charge is that you, sir, some
10    time between May 31, 2012 and September 10, 2012, in Hudson
11    County, did knowingly and intentionally conspire and agree with
12    others to distribute a controlled dangerous substance as
13    specified in the indictment, which included, among other
14    things, a mixture of heroin.
15              Is that the nature of the charge that you are aware
16    of?
17    A   Yes.
18    Q   You should know, and I think -- I assume your attorney has
19    said but I'll repeat -- that you are under no obligation
20    whatsoever to plead guilty to this charge.  You have a right to
21    have a trial by jury wherein the Government will be required
22    and have the burden of trying to prove your guilt beyond a
23    reasonable doubt to the satisfaction of that jury.  Follow me?
24    A   Yes.
25    Q   You will be under no burden; you will not have any duty to
```

1    try to prove that you're innocent because you are and will be

2    presumed innocent.

3            Do you understand that?

4    A    Yes.

5    Q    The Government will have the burden of trying to prove your

6    guilt to rebut that presumption.  They will have the burden of

7    trying to prove your guilt beyond a reasonable doubt to the

8    satisfaction of that jury.

9            Now, in that trial before that jury, you would have

10   the right to question any and everyone who might be called to

11   testify against you by the Government.  You with me?

12   A    Yes.

13   Q    And in that trial, even though you are under no obligation

14   to try to prove your innocence, you would have the right to

15   present for consideration of the jury and the judge any and all

16   legally and relevant defenses to the charge.  Do you follow me?

17   A    Yes.

18   Q    And in that trial, you'd have the right, if you wished, to

19   call people to testify for you as witnesses if that's what you

20   wanted to do.  You follow?

21   A    Yes.

22   Q    And you'd have the right to testify yourself as a witness

23   if that's what you wanted to do.  And you'd have the right not

24   to testify as a witness and have the judge instruct the jury at

25   your request that under no circumstances could the jury use the

1    fact that you had not testified against you.  In other words,

2    they could not hold it against you by deciding any issue in the

3    case whatsoever based on the fact that you had not testified as

4    a witness.  Do you follow?

5    A   Yes.

6    Q   But if you plead guilty today to this charge and I accept

7    your plea, you're giving up that right to a trial by jury.

8           Now is that what you really want to do?

9    A   Yes, sir.

10   Q   You're sure?

11   A   Yes.

12   Q   Have you had enough time to think this matter over?

13   A   Yes.

14   Q   Have you had enough time to discuss it with your attorney?

15   A   Yes.

16   Q   And you realize that if you plead guilty to this charge --

17   if you plead guilty to this charge, you expose yourself to

18   being sent to jail by me for not less than 5 years nor more

19   than 40 years in jail?

20   A   Yes, sir.

21   Q   Not less than 5 nor more than 40.  You understand that?

22   A   Yes.

23   Q   Do you further understand there's no such thing as parole

24   in the federal system?

25   A   Yes.

WALTER J. PERELLI, C.S.R., OFFICIAL COURT REPORTER, NEWARK, NJ

1    Q    That you can be expected to do, more likely than not, at
2    least 85 percent of any time that I impose upon you.
3    A    Yes, sir.
4    Q    So, in other words, if I were to sentence you, let's say,
5    to ten months in jail, you'd have to do at least eight and a
6    half months before you could be let out.  Do you understand
7    that?
8    A    Yes, sir.
9    Q    And in addition to any jail time imposed upon you, you
10   expose yourself to being fined by me not more than $1 million.
11   A    Yes.
12   Q    And in addition to that, you'll be required to serve --
13   wait a minute.  I think I may have misspoken.
14        THE COURT:  Is it one million or five million?  I
15   think we reach a point where it's academic.
16        MR. ALMONTE:  Your Honor, it's $5 million, your Honor.
17        THE COURT:  Well, then there's a typo in this, in the
18   middle of the first page.
19   BY THE COURT:
20   Q    All right.  So instead of one million, you expose yourself
21   to -- you're exposed to a fine of not more than $5 million.  Do
22   you understand that?
23   A    Yes.
24   Q    In addition to that, you'll be required after you come out
25   of jail to serve a period of Supervised Release of at least 4

```
 1    years.  And if during that period of Supervised Release you
 2    were to be found guilty of violating any of the terms of that
 3    period of Supervised Release, upon conviction you could be sent
 4    back to jail by me for a period of not more than 2 years
 5    without any credit being given to you for time you had already
 6    served in jail.
 7            Do you understand that?
 8    A   Yes.
 9    Q   Now, is this what you want to do?  You want to plead guilty
10    and expose yourself to what I just said by way of punishment in
11    the form of jail time, fine, and Supervised Release?
12    A   Yes.
13    Q   Are you doing this because your attorney with your
14    knowledge and consent has worked out a plea deal with the
15    Government?
16    A   Yes.
17    Q   Well, let's discuss this plea deal so that if I say
18    anything that you don't agree with, you let me know.  All
19    right?
20    A   Yes, sir.
21    Q   Okay.  I understand that if you plead guilty to Count 1 of
22    this Indictment of 13-341, the Government will not bring any
23    further charges against you arising out of what is contained in
24    that Indictment 13-341, and particularly, after you've been
25    sentenced, the Government will move to dismiss the remaining
```

```
1       counts of the indictment against you.  Is that your
2       understanding?
3       A    Yes.
4       Q    Whatever sentence that you get in this case will be up to
5       me and only up to me.  But before I -- and you're entitled to
6       receive from me a reasonable sentence.  And to help me do that;
7       that is, to give you a reasonable sentence, I'll be glad to
8       listen to what your attorney has to say, whatever you may wish
9       to say on your own behalf, what the Government's representative
10      may have to say.  I'll also read the presentence investigation
11      report.  And what that is, is a written report prepared by the
12      Probation Department which in writing will talk about the crime
13      to which you had pled guilty, your participation in it, the
14      participation of anybody else about whom the Probation
15      Department has information.  The Probation Department will also
16      talk about your background:  Where you were born, where you
17      were educated, your family structure, any health problems you
18      may have, your financial circumstances, and what type of work
19      you've done over the years, and what kind of criminal history
20      you may have, if any.  The Probation Department will prepare
21      that for me in writing for me to review.
22                I will also read the recommendations which are known
23      as "Sentencing Guidelines" passed by our Federal Congress, and
24      those are recommendations that our Federal Congress has written
25      to assist the judges in giving reasonable sentences to people.
```

1    And so -- who are to be sentenced.

2           Those guidelines are not binding upon me, nor are they

3    binding upon any other judge, but they do provide good advice

4    as to what judges might do under certain circumstances.  Under

5    certain circumstances the recommendations are that a judge

6    should impose maximum or minimum terms of imprisonment or fines

7    upon a person that is to be sentenced.  And if the

8    circumstances are different, then the recommendations may well

9    be that the judge probably should not impose minimum or maximum

10   terms of imprisonment or fines upon a person.

11          So, you see, all that is designed for me to review so

12   that I can give you a reasonable sentence.  You're entitled to

13   no less and you're entitled to no more than a reasonable

14   sentence.

15          Now, you and the Government have recognized the

16   importance of the Sentencing Guidelines that I just discussed,

17   those which have been passed by the Federal Congress, because

18   you've used them to work out some understandings, some

19   agreements between the two of you, between you and the

20   Government, which we call "stipulations."  And they are

21   attached as Schedule A to the October 3, 2013 letter to Mr.

22   Gilberti from Mr. Almonte.

23          So turn to that Schedule A, and you and I need to

24   discuss that.

25          Do you have it in front of you?

```
 1    A    Yes.

 2    Q    Now, the first paragraph acknowledges that the Sentencing

 3    Guidelines are not binding upon the Court.  But you and the

 4    Government have agreed to use them to work out some

 5    stipulations.  (Reading) This Office and Daniel Jenkins

 6    nevertheless agree to the stipulations set forth herein and

 7    agree that the Court should sentence Daniel Jenkins within the

 8    guideline range that results from the total guidelines offense

 9    level set forth below.

10              Is that your understanding?

11    A    Yes.

12    Q    Now, that last sentence of that first paragraph is very

13    important:  (Reading) This Office -- referring to the

14    Government -- and Daniel Jenkins further agree that neither

15    party will argue for imposition of a sentence outside the

16    guideline level -- strike that -- outside the guideline range

17    that results from the agreed total guidelines offense level.

18              So what you and the Government have worked out, those

19    will be -- that will be the area in which you're sentenced

20    according to you and the Government will be located.  Do you

21    understand that?

22    A    Yes.

23    Q    Neither one of you argue for anything beyond that.  Do you

24    follow?

25    A    Yes.
```

WALTER J. PERELLI, C.S.R., OFFICIAL COURT REPORTER, NEWARK, NJ

1    Q   Paragraph 2.  The Sentencing Guidelines which will be

2    effective November 1, 2012 apply to your case, Mr. Jenkins.

3           3.  Because the offense involved two different

4    controlled substances, phencyclidine and heroin, the quantities

5    and the substances involved in this case must be added together

6    after they have been converted to similar quantities of

7    marijuana.

8           So, paragraph 4.  The offense involved approximately

9    11.18 grams of PCP.  And pursuant to the Drug Equivalency

10    Table, 1 gram of PCP is equivalent to 10 kilograms of

11    marijuana.  Therefore, 11.18 grams of PCP is equivalent to

12    111.8 kilograms of marijuana.

13           Do you agree to that, sir?

14    A   Yes.

15    Q   Paragraph 5.  The offense also involved approximately 87.3

16    grams of heroin.  And pursuant to the Drug Equivalency Table, 1

17    gram of heroin is equivalent to 1 kilogram of marijuana.

18    Therefore, 87.3 grams of heroin is equivalent to 87.3 kilograms

19    of marijuana.  Right?

20    A   Yes.

21    Q   So the combined total -- I'm reading now from paragraph

22    6 -- the combined -- strike that -- the combined quantity of

23    PCP and heroin charged in Count 1 of the Indictment equals

24    199.1 kilograms of marijuana.  And because the combined

25    quantity of the controlled substances is more than 100

1    kilograms but less than 400 kilograms of marijuana, the Base

2    Offense Level is 26.

3          Is that what you've agreed to with the Government?

4    A   Yes.

5    Q   Paragraph 7.  I don't think I finished paragraph 6.

6          So if that be so, the offense level is 26.  See that

7    in paragraph 6?  The offense level is 26.  See that?

8    A   Yes.

9    Q   Do you agree to that?

10   A   Yes.

11   Q   As of then.

12         Now, if we go to paragraph 7:  If you are determined

13   to be a career offender pursuant to Sentencing Guideline 4B1.1

14   due to having sustained at least two prior felony convictions

15   for crimes of violence or controlled substance offenses, the

16   Base Offense Level for the present crime will be 34, and your

17   Criminal History Category will be VI.  See that?

18   A   Yes.

19   Q   And in the last sentence of that same paragraph:  You

20   reserve the right to argue at sentencing that you are not a

21   career offender, and the Government reserves the right to argue

22   that you are a career offender.  And I will be the one who will

23   decide whether you are or are not.

24         Do you understand that?

25   A   Yes, sir.

1    Q    So the offense level as I look at this will either be 26 or

2    34 depending how I determine whether you are a career offender

3    or not.  You see that?

4    A    Yes.

5    Q    As of the date of this letter from Almonte to your

6    attorney, you have clearly demonstrated a recognition of --

7    affirmative acceptance of personal responsibility for the

8    offenses charged, and if such continues to the time of your

9    sentencing, you'll be eligible for a downward adjustment of two

10   levels.

11            And, paragraph 9.  Because you're entering -- which is

12   a lot of verbiage, but it basically means that because you're

13   entering a sentence -- strike that -- because you're entering a

14   plea early on in litigation, you remove from the Government the

15   necessity of having to get prepared for trial and spend any

16   time and effort in preparation.  And if you maintain your

17   acceptance of responsibility for this crime to the time of

18   sentence, you'll be eligible for a further downward adjustment

19   of one level because of your entry of an early plea.

20            Do you follow?

21   A    Yes.

22   Q    So go to paragraph 10.  If I find that you are a career

23   offender pursuant to Sentencing Guideline 4B1.1, your guideline

24   offense level, Mr. Jenkins, will be 31.  Otherwise, if I do not

25   find that you're a career offender, your offense level will be

1  23.  And each, whether it be 31 or 23, is considered to be the

2  agreed total guidelines offense level.

3      Do you understand that?

4  A  Yes.

5  Q  And go to paragraph 11.  Both you and the Government also

6  agree not to seek or argue for any other upward or downward

7  departure, adjustment, or variance that's not set out.

8      Now, the last sentence of paragraph 11 I draw your

9  attention to:  You agree with the Government that a sentence

10  within the guideline range that results in the agreed total

11  guidelines offense level is reasonable.

12      Now, I want you to understand that if you agree that

13  the sentence that I impose upon you is reasonable, you have

14  very little, if any, chance of overturning such a sentence on

15  appeal to a higher court because you admit and agree that the

16  sentence was reasonable.  And that's all you're entitled to.

17  You follow?

18  A  Yes.

19  Q  As a matter of fact, in paragraph 12 you go even further.

20  You say that, provided I sentence you at a level of 31 --

21  that's not greater than 31, you're giving up your right to

22  challenge that sentence by way of appeal to me, to a higher

23  court such as the Court of Appeals, or you'll come back before

24  me by filing a petition or motion or writ, including the writ

25  of habeas corpus, to challenge that sentence.

```
1              And I take this time, Mr. Jenkins, to let you know.
2    See, normally when a person is sentenced by a judge he has the
3    right to challenge that sentence by saying the sentence is
4    wrong, unjust, should be set aside, corrected, modified, and he
5    has a right to appeal to a higher court, even come back to the
6    same judge.  That's called an unrestricted right of appeal.
7    You follow me?
8    A    Yes.
9    Q    But you're giving up that unrestricted right of appeal,
10   because you're saying provided I sentence you at a level that's
11   not greater than 31, you will not seek to challenge whatever
12   sentence that is by way of appeal to the Circuit Court of
13   Appeals or even coming back before me.  You understand that?
14   A    Yes.
15   Q    You know what you're doing?
16   A    Yes.
17   Q    You've discussed this with your attorney?
18   A    Yes.
19   Q    And have you had enough time to think it over?
20   A    Yes.
21   Q    Do you know what you're doing?
22   A    Yes.
23   Q    Okay.
24              Now, the next part is, the Government says:  Provided
25   I sentence you at a level that's not greater than 23, it too
```

1    gives up its right to challenge such a sentence on appeal.

2          Now, each of you has the right to appeal how I

3    determine your criminal history.  Each of you has the right to

4    do that; each of you has the right to oppose the other's

5    appeal.

6          These stipulations are binding upon you and the

7    Government, Mr. Jenkins.  And I assume that if one of you

8    backed out of the stipulations or welshed on the -- or reneged,

9    as the expression goes, on these stipulations, that would cause

10   the plea deal to collapse.

11         But those stipulations are not binding upon me, and if

12   I reject one or more of those stipulations you cannot take back

13   your plea of guilty.

14         You understand that?

15   A    Yes.

16   Q    Now, anything else that's left for you or the Government to

17   seek to appeal you certainly have a right to do so.  Each of

18   you has the right to oppose the other's appeal.

19         This agreement, this plea agreement, this plea deal is

20   only between you and this United States Attorney for this

21   District of New Jersey.  It's not binding on any other local,

22   state, or federal law enforcement officers -- or agencies,

23   rather, it's not binding upon any third party agencies such as

24   the Internal Revenue Service, nor is it binding upon any third

25   party from bringing any civil or administrative actions against

1    you.

2            Has anyone threatened you in any way to get you to

3    plead guilty to this charge?

4    A    No.

5    Q    Has anyone made any promises to get you to plead guilty to

6    this deal, or has anyone made any promises to anybody else to

7    get you to plead guilty to this charge that you and I have not

8    talked about today?

9    A    No.

10   Q    You're certain?

11   A    Yes.

12           THE COURT:  Mr. Gilberti, are you satisfied with the

13   discussion?

14           MR. GILBERTI:  Yes, I am, your Honor.

15           THE COURT:  Mr. Almonte, are you satisfied.

16           MR. ALMONTE:  I'm sorry?  What was your question, your

17   Honor?

18           THE COURT:  Are you satisfied with the discussion of

19   the plea bargain?

20           MR. ALMONTE:  Yes, your Honor, we are.

21           THE COURT:  We will now turn to the factual basis.

22   BY THE COURT:

23   Q    Going back to May of last year, from about May 31 through

24   September 12 of 2012, did you plan and agree and plot with John

25   Edwards and Claude Fields, and others, to distribute and

1   possess with intent to distribute PCP and heroin in Hudson
2   County and elsewhere?
3   A    Yes.
4   Q    And is John Edwards also known as "Johnny Roc"?
5   A    Yes.
6   Q    Okay.  And did you know that heroin and PCP are controlled
7   substances, and that it's illegal, it's against the law to
8   distribute those substances?
9   A    Yes.
10  Q    Specifically, with regard to this plot that you and Edwards
11  and others had, did you agree -- or, rather, did you some time
12  around June 7th of 2012, sell approximately five bricks of
13  heroin to somebody else?
14  A    Yes.
15  Q    Now, when I use the term "brick"; a brick contains
16  approximately 50 individual glassine envelopes of heroin.  Is
17  that correct?
18  A    Yes.
19  Q    Okay.  Now, do you agree then that some time around June 7,
20  2012, you distributed approximately 250 glassine envelopes,
21  each of which contained heroin?
22  A    Yeah.
23  Q    Right?
24       And also, in furtherance of that scheme or plot that
25  you had with Edwards and others, some time around June 14 of

```
1      2012, did Mr. Edwards give you approximately four small glass
2      jars that contained PCP?
3   A    Yes.
4   Q    And did you sell that PCP to a third party?
5   A    Yes.
6   Q    On that same day -- do you know Claude Fields?
7   A    Yes.
8   Q    Did he give you 15 "yams"; that is, raw heroin?
9   A    Yes.
10  Q    And did you sell those yams to a third person?
11  A    Yes.
12  Q    Twelve days later, some time around June 26th of the same
13     year, did you sell 11 bricks of heroin and three bottles of PCP
14     to somebody else?
15  A    Yes.
16  Q    And on July 18th of 2012, did -- as far as you know, did
17     John Edwards -- strike that "as far as you know."
18          Around July 18th, did John Edwards give you
19     approximately 14 bricks of heroin?
20  A    Yes.
21  Q    And did you sell those bricks to somebody else?
22  A    Yes.
23  Q    And you got paid for them.  Right?
24  A    I didn't hear you.
25  Q    Did you get paid for them?
```

```
 1   A    Yes.
 2   Q    You got money for them.  That's what I mean by that.  You
 3   got money for them.  Right?
 4   A    Yes.
 5   Q    And some time around July 23, 2012, did you sell an amount
 6   of PCP to somebody else?
 7   A    Yes.
 8   Q    And in August of that same year, particularly around August
 9   29, did you sell 20 bricks of heroin to somebody?
10   A    Yes.
11   Q    And in September, particularly around September 10th, did
12   you sell approximately 28 bricks of heroin to somebody else?
13   A    Yes.
14   Q    And I said to you earlier but I'll repeat:  In your
15   distribution and selling of PCP and heroin that you and I just
16   discussed, did you sell those drugs to people in exchange for
17   money?
18   A    Yes.
19   Q    And did all of these transactions take place across in
20   Hudson County?
21   A    Yes.
22   Q    And did you make these transactions and did you make these
23   sales and accept this money knowing that what you were doing
24   was -- involved -- involving illegal drug traffic?
25   A    Yes.
```

1     Q    Anyone put a gun to your head to make you do it, literally

2     or figuratively?

3     A    No, sir.

4     Q    You knew what you were doing?

5     A    Yes.

6     Q    You did it of your own free will?

7     A    Yes.

8     Q    You're sure?

9     A    Yes.

10    Q    Are you guilty of the crimes charged against you in Count 1

11    of Indictment 13-646?

12    A    Yes.

13              THE COURT:  All right.  Are you satisfied, Mr.

14    Gilberti?

15              MR. GILBERTI:  Yes, your Honor.

16              MR. ALMONTE:  Yes, your Honor.  And the Government

17    also represents to the Court that the substance seized in this

18    case was, in fact, 10 grams or more of a mixture and substance

19    containing phencyclidine (actual), a Schedule II controlled

20    substance, contrary to Title 21 United States Code, Sections

21    841(a) and 841(b)(1)(b); and, a quantity of a mixture or

22    substance which contained a particular amount of heroin, a

23    Schedule I controlled substance, contrary to Title 21 United

24    States Code, Section 841(a) and 841(b)(1)(c).  And had this

25    case proceeded to trial, the United States would be prepared to

```
 1     prove beyond a reasonable doubt each of the elements of Count 1
 2     of the Indictment, Criminal Number 13-646 through law
 3     enforcement testimony, video recordings, a confidential source,
 4     and documentary evidence, among other things.
 5              THE COURT:  Have you signed the Application to Plead
 6     Guilty in this matter, Mr. Jenkins?
 7              THE DEFENDANT:  Yes.
 8              THE COURT:  And before you signed it, did you read it?
 9              THE DEFENDANT:  Yes.
10              THE COURT:  Have you been satisfied with the advice of
11     counsel your attorney has given you so far?
12              THE DEFENDANT:  Yes.
13              THE COURT:  Have you had any problems with him?
14              THE DEFENDANT:  No, sir.
15              THE COURT:  I will accept your plea of guilty, and I
16     will sentence you on March 11 of 2014 at 9:30 in the morning.
17     March 11, 2014.
18              MR. ALMONTE:  Your Honor, I have a request.
19              THE COURT:  Which is?
20              MR. ALMONTE:  The Defendant was placed under oath
21     after the proceeding had started.  I was wondering if --
22              THE COURT:  I can't hear you.
23              Have a seat, Mr. Jenkins.
24              Come up, Mr. Almonte.
25              THE COURT:  Yes, sir.
```

1              MR. ALMONTE:  Thank you, your Honor.

2              The Defendant was placed under oath after the series

3       of questions concerning the conflict of interest.  My request

4       to the Court is that he be asked whether everything that he

5       testified about was, in fact, truthful, and that the oath apply

6       retroactively.

7              I'm sorry, your Honor, I do have one other request.

8              With respect to the conflict of interest --

9              THE COURT:  Right.

10             MR. ALMONTE:  -- if you can place on the record that

11      you, in fact, find that he waived the conflict of interest

12      knowingly and voluntarily, we would greatly appreciate that,

13      your Honor.

14             THE COURT:  All right.

15             MR. ALMONTE:  Thank you.

16             THE COURT:  Mr. Jenkins --

17             THE DEFENDANT:  Yes.

18             THE COURT:  -- the Assistant United States Attorney

19      would like you to confirm that what you told me before I placed

20      you under oath with regard to the potential conflicts of

21      interest with Gilberti representing you and Mr. Edwards are all

22      right by you.  You remember you and I had that discussion?

23             THE DEFENDANT:  Yes.

24             THE COURT:  He wants to make sure that you would have

25      said the same thing if under oath.

```
1              THE DEFENDANT:  Yes.

2              THE COURT:  Would you?

3              THE DEFENDANT:  Yes.

4              THE COURT:  I can't hear you.

5              THE DEFENDANT:  Yes.

6              THE COURT:  All right.  So you don't have any problem

7    in saying what you -- what you -- that you have no problem in

8    saying that you're satisfied with what Gilberti has been doing

9    for you so far.  Is that right?

10             THE DEFENDANT:  Yes.

11             THE COURT:  And you giving up any right to challenge

12   anything based on any alleged conflict of interest because he

13   represents Edwards.  Is that right?

14             THE DEFENDANT:  Yes.

15             THE COURT:  You're sure?

16             THE DEFENDANT:  Yes.

17             THE COURT:  All right.  Well, I find you have done

18   that willingly and voluntarily, and that's it.

19   MR. ALMONTE:  Thank you very much, your Honor.

20             THE COURT:  Okay.  That's it?

21             All right.

22             (Conclusion of proceedings.)

23                          ooOoo

24

25
```

WALTER J. PERELLI, C.S.R., OFFICIAL COURT REPORTER, NEWARK, NJ

# EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
 2                  Criminal No. 2:13-cr-646-WHW

 3

 4    UNITED STATES OF AMERICA,    :
                                   :    TRANSCRIPT OF PROCEEDINGS
 5              v.                 :       - Sentencing Hearing -
                                   :
 6    DANIEL JENKINS,              :
                                   :
 7              Defendant.         :
      - - - - - - - - - - - - - - -

 8

 9                                 Newark, New Jersey
                                   March 11, 2014
10

11    B E F O R E:

12                   THE HONORABLE WILLIAM H. WALLS,
                      UNITED STATES DISTRICT JUDGE
13

14    A P P E A R A N C E S:

15        UNITED STATES ATTORNEY'S OFFICE
          BY:  JOSE ALMONTE
16             Assistant U.S. Attorney
          For the Government
17
          MICHAEL V. GILBERTI, ESQ.
18        For the Defendant

19

20    Pursuant to Section 753 Title 28 United States Code, the
      following transcript is certified to be an accurate record as
21    taken stenographically in the above entitled proceedings.

22
      S/WALTER J. PERELLI
23

24
      WALTER J. PERELLI, CCR, CRR
25    Official Court Reporter
```

```
 1              THE COURT:  Today is the scheduled sentence day for
 2   Daniel Jenkins.
 3              Enter your appearances.
 4              The rest of you may be seated.
 5              MR. ALMONTE:  Good morning, your Honor.  Assistant
 6   United States Attorney Jose Almonte, on behalf of the
 7   Government.
 8              MR. GILBERTI:  Good morning, your Honor.  Michael
 9   Gilberti on behalf of Mr. Jenkins, who is standing to my left.
10              THE COURT:  And tell me, Counsel, has your client read
11   and reviewed the Presentence Investigation Report?
12              MR. GILBERTI:  Yes, he has.
13              THE COURT:  And as I understand and read, according to
14   the Sentencing Guidelines, there is an offense level of 31 with
15   a Criminal History Category of VI, which exposes your client to
16   custody between 188 to 235 months.  Do you challenge that?
17              MR. GILBERTI:  Yes, we have, your Honor.
18              THE COURT:  Come to the lectern and let me hear from
19   you on his behalf.
20              You may be seated, sir.
21              MR. GILBERTI:  Your Honor, we make really two
22   challenges.  His plea agreement, the underlying offense was a
23   Level 23, Criminal History V.  And we kept open the ability to
24   challenge the possibility that the Probation office would find
25   him as a career offender.
```

WALTER J. PERELLI, C.S.R., OFFICIAL COURT REPORTER, NEWARK, NJ

1     What we have here, your Honor, is the career

2 offender -- you have discretion whether or not to rule that

3 he's a career offender.  And in this case, your Honor, what we

4 have here is, we're in an era where Congress is conducting

5 hearings on the Draconian results of drug sentencing over the

6 years.  And in this case, your Honor, the Government wants to

7 sentence him to 188 to 235 months -- that's 16 and a half to 20

8 years -- for a criminal history that includes less than a pound

9 of drugs.  In fact, it's probably less than a half a pound.

10     THE COURT:  Wait, stop, stop.  Slow, slow so that we

11 can make sure that you and I are on the same page as well as

12 the Assistant United States Attorney.

13     I just want to make sure that -- your client, as I

14 understand it, is 40 years of age?

15     MR. GILBERTI:  Yes, your Honor.

16     THE COURT:  Is that correct?

17     MR. GILBERTI:  That's correct, your Honor.

18     THE COURT:  Okay.  And now, turning to page -- page 12

19 of the Presentence Investigation Report.

20     MR. GILBERTI:  I have it, your Honor.

21     THE COURT:  And we'll run over what are juvenile

22 matters.  Okay.

23     MR. GILBERTI:  Hang on a second, your Honor.

24     THE COURT:  And that takes us up to page 15.  Right?

25     MR. GILBERTI:  Correct.

4

```
1              THE COURT:  Am I right so far?

2              MR. GILBERTI:  Yes, you are.

3              THE COURT:  All right.

4              MR. GILBERTI:  Correct.

5              THE COURT:  Now we get to paragraph 58, we have a

6    conviction for fraud.  Right?

7              MR. GILBERTI:  Correct.

8              THE COURT:  We go to paragraph 60 -- by the way, that

9    is in November of 1991 when he was age 18.  Then we go to page

10   16, and at the age of 19, in March of 1993 he's found guilty of

11   receiving stolen property by the New Jersey Municipal Court.

12   Is that correct?

13             MR. GILBERTI:  Correct.

14             THE COURT:  Then we go to November of 1993, in the

15   Superior Court of New Jersey in Hudson County vicinage, he's

16   convicted of aggravated assault, admitted to simple assault

17   which is -- which subjects him to one year of probation.

18   Right?

19             MR. GILBERTI:  Correct.

20             THE COURT:  He's thereafter arrested, as reflected by

21   paragraphs 63 and 64, for a history which I don't know about.

22             Does the U.S. Attorney know anything about 63 and 64?

23             MR. ALMONTE:  No, your Honor, other than --

24             THE COURT:  All right.  Other than what's reflected in

25   the paragraph.  Is that correct?
```

```
 1              MR. ALMONTE:  Correct, your Honor.
 2              THE COURT:  Paragraph 65, at the age of 21, in June of
 3   1995, he's found guilty of distribution of CDS within 1,000
 4   feet of school property, again by the Hudson County vicinage of
 5   the Superior Court.  He's sentenced to five years in State
 6   Prison.  He's paroled in June of 1997, and parole is revoked in
 7   June of 1999.  And that's discussed in paragraphs 66 and 67.
 8              Am I right so far?
 9              MR. GILBERTI:  That's correct, your Honor.  And that
10   involved less than a half an ounce of drugs.
11              THE COURT:  All right.  But I'm talking about the
12   crime now.  Okay?
13              MR. GILBERTI:  I understand.
14              THE COURT:  Fair enough?
15              MR. GILBERTI:  Fair enough.
16              THE COURT:  In paragraph 68, he's originally charged
17   with aggravated assault on a law enforcement officer, but then
18   it's amended to "tried to prevent official action," for which
19   he received six months incarceration by the Superior Court of
20   Hudson County.  That's reflected in the following paragraphs:
21   68a. and b. and c.;
22              Then in paragraph 70, he's originally charged with
23   resisting arrest but it's amended to disorderly conduct for
24   which he gets six months.  That's a disorderly persons;
25              And then at age 24 he's consuming alcohol in a public
```

```
 1      place and he's charged with an ordinance violation in paragraph
 2      74.
 3              But getting to a more substantive issue, he's
 4      thereafter found guilty of possession of CDS with intent to
 5      distribute within 1,000 feet of school property in 2002, April
 6      14, at the age of 28.  He's given five years special probation,
 7      but he's found in violation of that probation on April 8th and
 8      he's resentenced to five years in State Prison with a
 9      three-year parole ineligibility; and
10              in paragraph 80 he goes across the river and is found
11      guilty of criminal possession of CDS by the New York County
12      Supreme Court, for which he gets five years probation.
13              For some reason this reflects he has an open bench
14      warrant but I don't know why, but be that as it may.  And there
15      he's charged with possession of narcotics with the intent to
16      sell.  This arises out of that.  He's charged with being found
17      at 135th and Amsterdam in New York.
18              Now, the point is that I'm looking at -- there's some
19      confusion here as far as I'm concerned.  Paragraph 83, there's
20      a reference made to the Southern District of New York Federal
21      Court, but I thought all of this dealt with Supreme Court of
22      New York.
23              Can you enlighten me on this?
24              MR. GILBERTI:  I can't, your Honor.  We were taken
25      by --
```

WALTER J. PERELLI, C.S.R., OFFICIAL COURT REPORTER, NEWARK, NJ

```
 1              THE COURT:  You see the collateral response of the
 2    Probation Office of the Southern District indicates the
 3    defendant absconded from the above probation sentence and the
 4    bench warrant remains active.
 5              Unless it's a misprint as far as this action of
 6    criminal possession of CDS occurred not in the Supreme Court
 7    but in the Southern District jurisdiction.
 8              MR. GILBERTI:  Well, it might have been a UFAB, your
 9    Honor.  They may have taken the warrant to the Southern
10    District and gotten a Uniform -- UFAB application.
11              THE COURT:  Is that what they did?
12              THE PROBATION OFFICER:  No, Judge.  This paragraph
13    just simply means that we asked our counterparts in Manhattan
14    to research the warrant for us.  There is a warrant from New
15    York County Supreme Court.
16              THE COURT:  Oh.  You just asked the Southern District
17    to do that?
18              THE PROBATION OFFICER:  Yes.
19              THE COURT:  Okay.  Fair enough.  All right.  Okay.
20              Then again in October of 2002 he's found guilty of
21    possession of CDS, for which he is given five years probation,
22    but then later on that probation is revoked and he's sentenced
23    to five years with a three-year ineligibility, which relates
24    also to the episode of April 14, 2002.  The sentence applied to
25    both instances.  All right?
```

1          MR. GILBERTI:  Correct.

2          THE COURT:  Okay.  Then back in December of 2002 he is

3   again confronted with possession of CDS with attempt to

4   distribute within 1,000 feet of school property in the Superior

5   Court of Hudson County, for which he again receives five years

6   probation.  And then, as with the other two matters, he's found

7   guilty in April of 2005 of violation of probation and he's

8   sentenced to five years with a three-year period of

9   ineligibility, parole ineligibility.  So, in other words, he

10  has a threesome there:  He has three separate convictions which

11  merge into a violation of probation.

12          Am I right?

13          MR. GILBERTI:  There were five, your Honor.  There

14  were five in total.

15          THE COURT:  Well, we're getting to it slowly, but

16  surely we're getting there.  All right.

17          MR. GILBERTI:  The tally sheet right now is three.

18          THE COURT:  All right.

19          Then we have a loitering to obtain and sell CDS in

20  October of 2003, which again is the subject of this matter of

21  probation revocation and sentencing on April 2005.  Right?

22          MR. GILBERTI:  Correct.  That's four.

23          THE COURT:  That's four.

24          Now we started out earlier when he was 18.  See,

25  that's wonderful.  He started out at 18.  He's now age 29.

```
 1      He's charged with bail-jumping in Superior Court, Hudson County
 2      at age of 30, and he was subjected to being sent to State
 3      Prison for seven years with a 42-month parole disqualifier, but
 4      the prosecutor recommended that he participate in a long-term
 5      in-patient drug program;
 6              At the age of 35 he's convicted of harassment by the
 7      New Jersey -- strike that -- by the Jersey City Municipal Court
 8      which he's required to do 240 hours community service.
 9              Now that's the history.  Am I right?
10              MR. GILBERTI:  You're correct, your Honor,
11              THE COURT:  I wanted to make sure I spelled it out
12      particularly for anybody who might be interested in hearing it.
13              So consequently, based upon that, what do you claim?
14              MR. GILBERTI:  Your Honor, well, first, there was the
15      five --
16              THE COURT:  Do you challenge any of the history?
17              MR. GILBERTI:  I'm challenging the severity of the
18      history.
19              THE COURT:  I'm not talking about that.  You're
20      talking about the effect --
21              MR. GILBERTI:  I'm not challenging the facts of the
22      history.
23              THE COURT:  That's what I'm driving at.
24              MR. GILBERTI:  No, I'm not challenging the facts of
25      the history.
```

```
 1              THE COURT:  Go ahead.

 2              MR. GILBERTI:  What I am challenging, your Honor, is

 3    the severity of the history.  The five offenses that you just

 4    went through, they were all resolved on the same day, ended up

 5    in -- originally a probationary sentence, and they were all

 6    second and third -- they were all third and fourth degree and

 7    municipal court level offenses, they were disorderly persons

 8    offenses.

 9              THE COURT:  Not the drug matters.

10              MR. GILBERTI:  The drugs that were involved there were

11    relatively small --

12              THE COURT:  CDS within a thousand feet of school

13    property --

14              MR. GILBERTI:  You're right there, your Honor, you're

15    right there.

16              But they gave -- they ended up -- ending up in 5

17    offenses that account for seven criminal history points ending

18    up in a probationary sentence.  Now he violated that because of

19    his drug problem.

20              THE COURT:  Regardless of what reason he violated it,

21    for which he later received a custodial term in the State

22    Prison --

23              MR. GILBERTI:  Correct.

24              THE COURT:  -- with a parole disclaimer.

25              MR. GILBERTI:  But the net effect, your Honor, is,
```

```
 1      even though there were intervening offenses or arrests -- and I
 2      understand the legal significance of that -- what I'm
 3      suggesting to you is, the way that the prosecution in the state
 4      decided to resolve that matter overstates this thing.  It was
 5      not a -- originally it was not a custodial sentence.  And
 6      you're applying seven criminal history points for what were
 7      relatively minor -- and again, in a hierarchical sense,
 8      relatively minor criminal conduct --
 9              THE COURT:  This is not like it was armed robbery, I
10      understand, or rape --
11              MR. GILBERTI:  Right.
12              THE COURT:  -- or treason.  I understand that.  Go
13      ahead.
14              MR. GILBERTI:  And that's the basis of my argument,
15      your Honor, that his criminal history is overstated.  And when
16      you look at it --
17              THE COURT:  But his criminal history has such
18      longevity.  He started out -- I didn't bother to deal with the
19      juvenile matter in fairness, but since the age of 14 he has
20      been in and out of court.
21              MR. GILBERTI:  That's correct, your Honor.  But since
22      the age of 30, the only problems he had was violating his
23      probation and the harassment charge, which is a municipal court
24      matter in Jersey City.  That's 10 years, your Honor.  He did
25      attempt to resurrect his life during that period and was
```

```
 1      attempting to correct things.  And given the disparate

 2      proportion of the sentence -- I mean, the points that he got

 3      for what was relatively less important criminal history, we

 4      believe that, one, it does overstate his life's work to

 5      characterize him as a career offender based on the relatively

 6      minor history there.  This isn't a guy who was dealing kilo

 7      amounts of drugs.  This isn't --

 8              THE COURT:  But this is a guy who's been given,

 9      apparently primarily in Hudson County, the benefit of the doubt

10      practically every time he appeared, and he appeared regularly

11      in the sense that I see nothing but probation, probation.

12      probation.  At long last the prosecutor said, no more of this.

13              Isn't that basically it?

14              I mean, it wasn't a situation where he was hit at the

15      outset and continued to be so hit with custodial terms.  He's

16      been given opportunities for rehabilitation throughout his

17      youth.

18              MR. GILBERTI:  You're correct.  But in the recent

19      years, your Honor -- and again, this gets back to my argument

20      about the distance from that, remoteness from that I think

21      that's also a factor here.  So we believe that for the reasons

22      that we set forth in our sentencing memo, when you look at it

23      comparatively, you have the discretion -- if you sentence him

24      to the amount that's contained in his plea agreement which is a

25      Level 23, Criminal History V, he's going to be away for seven
```

```
 1    to nine years.  He has 84 to 105 months.  That's more than
 2    sufficient given his criminal history and given the fact
 3    offenses in this case, and given the relatively minor amount of
 4    drugs he's dealt with in his career to make the point, to send
 5    a message to society from the standpoint of deterrence, it's
 6    more than sufficient to punish him because he's going to come
 7    out at age 46 and, you know, he's going to be an older guy
 8    there, and we've argued about the recidivism rate as people get
 9    older, and it will also permit him to rehabilitation in the
10    process, your Honor.  So we believe that if you sentence him to
11    the underlying offense you can make the same point without
12    putting him away for 16 years when you're --
13              THE COURT:  What specifically is the underlying
14    offense, now that you bring it up?  What is it?  Conspiracy to
15    distribute what?
16              MR. GILBERTI:  It was PCP and heroin.  And the amounts
17    were 11 grams of PCP, and something like 80 grams or 90 grams
18    of heroin.  You're talking amounts that are less than several
19    ounces; three, four ounces, your Honor.
20              Again, this is street level matters.  And again, I'm
21    not denigrating street level matters.  When I was Chief of
22    Narcotics at the U.S. Attorney's Office across the street in
23    the '80s we would have sent this to the State.  For whatever
24    reason, the Feds and the State are attempting to make a point
25    here.  But you can make that same point by sentencing him to
```

1    the underlying offense, which is substantial.

2        THE COURT: Well, except that we have a response dated

3    March 6th, 2014 in direct reply to what you just said. And let

4    me read it to you so that you are aware of what I'm quite sure

5    your adversarial colleague will say when I give him an

6    opportunity to be heard; that is, he says on page 1: (Reading)

7    Jenkins distributed narcotics to an undercover agent in the

8    course of seven separate transactions. The quantity of PCP

9    .involved in this case was significant, enough that the United

10    States Congress requires this Court to impose a statutory

11    mandatory minimum sentence of at least five years in prison.

12        That point is taken. All right?

13        In addition -- this is what is of interest to this

14    Court -- the quantity of heroin that Jenkins sold to the

15    undercover agent was enough to supply at least 3900 individual

16    drug addicts even by the most conservative estimate.

17        And why I say that is because you as part of your

18    argument indicate that what he sold was not that, let's say,

19    "Nicky Barnes," or another reputed drug dealer, or the one that

20    was just apprehended handed in Mexico. But you are aware of my

21    position with regard to drug dealing.

22        MR. GILBERTI: Yes, I am, your Honor.

23        THE COURT: And I believe that it is dangerous, so

24    dangerous that it is contagious, that it is destructive of all

25    of us. So that he was on the street is really of no moment to

1     me.

2            MR. GILBERTI:  No, I --

3            THE COURT:  He engaged in something that could kill so

4     many people and affect so many people.  As I said before and

5     I'll say it to you again at the benefit of repetition:  Drug

6     dealing in this country affects all of us because all of us, if

7     we're honest enough, know that someone whom we know or even

8     someone who we've been related to or even heard of, have been

9     affected by it, either by usage or by being an innocent victim,

10    or being an innocent victim of a drive-by shooting or mugging,

11    you know.

12           And so those -- and it hits everybody.  It hits

13    everybody regardless of race or class or ethnicity, and it cuts

14    across borders.  It is just -- it is a plague.  And it does us

15    no good to say, well, he's a nice boy.

16           You see, I read a letter from someone saying, well,

17    I've known him for 16 years.  He's always been nice.

18           As far as I'm concerned, no one selling drugs

19    willingly is nice.

20           Go ahead.

21           MR. GILBERTI:  I'm not arguing that point.  And to the

22    extent that you're relying on that information, that's hearsay

23    and I don't believe it should be relied on absent a hearing

24    where we can challenge it.  But laying that aside --

25           THE COURT:  You're talking about the 3900?

```
 1              MR. GILBERTI:  Yes, that information.

 2              But laying that aside, your Honor, I'm not saying he's

 3     a nice boy, that's not my argument.

 4              THE COURT:  You sent me a letter --

 5              MR. GILBERTI:  I sent you a letter in mitigation of

 6     sentencing, and that was for part three of the structure.  The

 7     first one is fixing the --

 8              THE COURT:  What you're saying is that -- you're

 9     saying that seven to nine is sufficient punishment.  That's

10     what you're saying.

11              MR. GILBERTI:  That's exact what I'm saying, your

12     Honor.

13              THE COURT:  I see.  The point is, you may have a

14     point -- I'm not saying do -- but you may have a point.  He's

15     40 years of age.  According to the table he probably has

16     another at least 30-plus, 40 years to go statistically unless

17     he has an untoward event that shortens his life expectancy.  So

18     he's really middle age, you know.  So the point is, how is he

19     going to spend the rest of his life?  So far he's spent most of

20     his life in and out of jail.  Whether it's momentarily or --

21     that's why I deliberately went down and chronicled the history.

22     So we'll see.

23              What else to do you want to tell me before I turn

24     it -- with regard to this issue, I want to hear from the

25     Assistant United States Attorney.  Anything else you want to
```

```
1    tell me?

2              MR. GILBERTI:  No.  I just wanted to make sure that

3    his trend in his life was an upward trend at the time this

4    occurred.  Now again, the 2009 municipal court thing, and from

5    2008 onward, you know, there was very little else.  So we would

6    submit that to you, and that comes in at the -- you know, for

7    the interest of rehabilitation, the aspects of this thing, that

8    we can reclaim a life here.

9              THE COURT:  He's been given ten-plus years of

10   rehabilitation attempts.  It's almost mind-boggling to say,

11   knowing what Hudson County does -- I used to sit on the

12   Superior Court here in Excess.  But this history is quite

13   interesting, that he was given so many times a chance to get

14   his act together.

15             Anyway, be that as it may.

16             MR. GILBERTI:  Thank you, your Honor.

17             THE COURT:  With regard to this issue.

18             MR. ALMONTE:  Thank you very much, your Honor.

19             THE COURT:  Yeah.

20             MR. ALMONTE:  And as you already stated, you do have

21   discretion to depart downward, but the Government would urge

22   your Honor to not do so.

23             THE COURT:  Why?

24             MR. ALMONTE:  Well, your Honor went through all the

25   history, but just to put it in perspective, and I know you
```

```
 1    started with the age of 18.  I go back two more years.  And
 2    since the age of 16 to the age of 38 when he was arrested in
 3    this case, he accumulated 17 convictions.  And one was for
 4    robbery; there were at least two simple assault; and seven drug
 5    convictions.
 6              THE COURT:  In fairness, in fairness, I appreciate
 7    you -- I deliberately did not go into the juvenile just from
 8    the standpoint I figured, you know, even juveniles can be tried
 9    as adults.  But he wasn't, he was tried as a juvenile.  So I
10    felt I would not consider that in fairness to him because, you
11    know, they're crazy teenagers.
12              MR. ALMONTE:  That's a fair point, your Honor.
13              THE COURT:  As a parent I know that.  Go ahead.
14              MR. ALMONTE:  So one of the points that the defense
15    made in favor of not applying the career offender guidelines is
16    that the amount in this case is small --
17              THE COURT:  Right.
18              MR. ALMONTE:  -- and that his prior convictions are
19    small.
20              THE COURT:  Right.
21              MR. ALMONTE:  There are two responses to that.  As a
22    factual matter that's not correct.  Your Honor took interest in
23    the 3900 -- or when I stated that the amount of heroin here --
24              THE COURT:  Which is challenged by your colleague.
25              MR. ALMONTE:  Right.
```

1          And your Honor presided over the plea hearing.  During
2     that colloquy we went specifically and discussed the term
3     "brick" and what "brick" means.  And that means that that
4     amount of heroin was packaged in individual glassine envelopes
5     so that it could be distributed to individuals.  Therefore, one
6     brick is equivalent to 50 glassine envelopes for individuals.
7     There were 78 bricks of heroin.
8          THE COURT:  How many?
9          MR. ALMONTE:  78.
10         THE COURT:  78?
11         MR. ALMONTE:  So --
12         THE COURT:  So therefore?
13         MR. ALMONTE:  Therefore that's --
14         THE COURT:  The mathematical calculation doesn't
15    require my having a hearing.
16         MR. ALMONTE:  Exactly, your Honor.  And it's also
17    stated in the Presentence Report.
18         So that's where we get the 3900 individual doses.
19         THE COURT:  Well, let's assume -- I take your point.
20    Let's assume that that heroin was of that sufficient quantity,
21    so then it would have equated to 3900 hits.  But how much is
22    enough in the context of reasonableness as far as sentence is
23    concerned?  You follow what I'm saying?
24         MR. ALMONTE:  I understand, your Honor.
25         THE COURT:  What you're talking about, should I give

```
 1      him 16 years at least according to your -- 188.  Right?
 2                  MR. ALMONTE:  Yes.
 3                  THE COURT:  Or take him out to practically 20 in 235?
 4                  MR. ALMONTE:  Your Honor, I --
 5                  THE COURT:  That's the spread, isn't it:  188 to 235?
 6      If I were to give him 235 that would be practically 20 years.
 7                  MR. ALMONTE:  Correct.
 8                  THE COURT:  Right?
 9              Twenty times 12, that's what I'm saying.  So that's no
10      big deal.  You follow what I'm saying?
11              But I look at it in what I hope to be a reasonable
12      situation.  There's no parole in our federal system.
13                  MR. ALMONTE:  That's correct.
14                  THE COURT:  So we expect him to do at least 85 percent
15      of whatever time I do give him.  And at the same time, the
16      goals are to punish as well as to afford, if necessary, or if
17      appropriate, if appropriate, not if necessary, if appropriate,
18      the chance to rehabilitate oneself.
19                  MR. ALMONTE:  Correct.
20                  THE COURT:  So if I give him 20 years I just confine
21      him to being a senior citizen in jail.  Right?
22                  MR. ALMONTE:  Correct.
23                  THE COURT:  Because he's 40 now.  And if I come down
24      to 188, he has spent all of his youth and practical middle age
25      in jail too.  Which one does he deserve?  And that's the
```

```
 1    question we have to deal with in the context of the factors
 2    that we analyze for sentencing and the context of trying to
 3    afford him a reasonable sentence.  And your colleagues speaks
 4    that for the last more or less 10 years he's been relatively
 5    clean.
 6              MR. ALMONTE:  Your Honor, that's actually not correct.
 7    When you take into account --
 8              THE COURT:  Let me hear what you have to say.
 9              MR. ALMONTE:  Well, when you take into account the
10    period of incarceration, I believe that offense was in 2004.
11    And he was released on parole, then that parole was revoked and
12    he was sent back to jail until May of 2008.  So the starting
13    point is May 2008 because that's when he was released from
14    prison.  And then about a year later he again committed another
15    crime, that one concerns harassment.  And then two years after
16    that he committed this crime.  So he hasn't lived -- it's not
17    as if he lived 10 years crime-free in society.  Part of that
18    was incarceration.
19              THE COURT:  Let me find out something from you,
20    because where is the original plea agreement?  Let me see the
21    original plea agreement.
22              MR. ALMONTE:  I don't have the original with me.
23              THE COURT:  I only have -- I only have a part of it --
24    what did we finally end up in the plea agreement with the
25    level?
```

```
1              MR. GILBERTI:  It was Level 23.
2              THE COURT:  I can't hear you.
3              MR. GILBERTI:  Level 23.
4              THE COURT:  23, with a Criminal History of V?
5              MR. GILBERTI:  Correct.
6              THE COURT:  Because I don't see how it was reached in
7      my copy of the presentence investigation.  It stops at 31, and
8      I didn't...
9              MR. ALMONTE:  Your Honor, on page 8 --
10             THE COURT:  Page 8?
11             MR. ALMONTE:  -- paragraph 10 it sets forth what the
12     agreed total --
13             THE COURT:  I'm with you now.  Yeah, right.  So it's
14     either 31 or 23, depending on what I determine.
15             MR. ALMONTE:  Correct, your Honor.
16             THE COURT:  Oh.  I'm with you now.  I'm with you now.
17     All right.
18             What say you with regard to the earlier offense, the
19     earlier -- the earlier felony?
20             MR. ALMONTE:  Well, there were three convictions that
21     are the predicate --
22             THE COURT:  That's what -- I'm examining the
23     predicate.  Go ahead.
24             MR. ALMONTE:  -- for the career offender status.
25     There was one on June 9th, 1995, and that's found in paragraph
```

WALTER J. PERELLI, C.S.R., OFFICIAL COURT REPORTER, NEWARK, NJ

```
 1    65.
 2              THE COURT:  Right.
 3              MR. ALMONTE:  And that was for distribution.
 4              THE COURT:  That was, as I recall it, within a
 5    thousand feet, wasn't it?
 6              MR. ALMONTE:  That's correct, your Honor.
 7              THE COURT:  At the age of 21 --
 8              MR. ALMONTE:  Correct.
 9              THE COURT:  -- probably in Jersey City, but anyway, in
10    Hudson County, he got five years.
11              MR. ALMONTE:  Correct.
12              THE COURT:  All right.  Go ahead.
13              MR. ALMONTE:  And he didn't learn his lesson then,
14    your Honor, because --
15              THE COURT:  Wait.  Slow up, slow up, slow up, slow up.
16              We do have some idea of what it was.  He distributed
17    cocaine.  He distributed cocaine of less than a half an ounce.
18              MR. ALMONTE:  That's correct, your Honor.
19              THE COURT:  At the same time he allegedly possessed
20    heroin of less than a half ounce as well.  Okay.  All right.
21              Go ahead.  All right.  Now what's -- now that's the
22    first.  What's the second?
23              MR. ALMONTE:  The second predicate offense is found on
24    paragraph 76.
25              THE COURT:  At the age of 28.
```

```
1              MR. ALMONTE:  Correct.

2              THE COURT:  Again, he's charged with and found guilty

3    of possession with CDS with attempt to distribute within a

4    thousand feet of school property in Hudson County, and he is

5    distributing cocaine as well as heroin.

6              MR. ALMONTE:  As well as -- no, that's correct, your

7    Honor, just heroin and cocaine.

8              THE COURT:  Right.  Is that right?

9              MR. ALMONTE:  Yes, your Honor.

10             THE COURT:  And he gets five years special probation.

11   That's when I was telling you about what happened in Hudson

12   County Superior Court.

13             All right.  And now we have --

14             MR. ALMONTE:  Then there's one more, your Honor.

15             THE COURT:  Which is?

16             MR. ALMONTE:  In paragraph 88.

17             THE COURT:  Again, possession of CDS with attempt to

18   distribute within a thousand feet of school property at age of

19   29, and there he's found with six vials of cocaine and 70 bags

20   of heroin.

21             MR. ALMONTE:  That's correct, your Honor.

22             THE COURT:  Right?

23             Go ahead.

24             MR. ALMONTE:  So two points, your Honor.  As a factual

25   matter I disagree that those were small offenses.  But even if
```

1    your Honor --

2            THE COURT:  He didn't say they're small offenses, he

3    said they're small amounts.

4            MR. ALMONTE:  Small amounts.

5            THE COURT:  Right.

6            MR. ALMONTE:  But if your Honor were to consider those

7    small amounts, legally the Third Circuit has affirmed cases

8    where the amounts were even smaller.  I cited one particular

9    case --

10           THE COURT:  I know, but that's all within the

11   discretion I have here though.

12           MR. ALMONTE:  Of course.

13           THE COURT:  I mean, I could call something half full;

14   you might call it half empty.  Both of us should be affirmed

15   because if we did a reasonable analysis you would come up with

16   a conclusion.  Right?

17           MR. ALMONTE:  But just to highlight one case, your

18   Honor, in United States vs. McCleve (phonetic), which is cited

19   in the memorandum, in that case a defendant was sentenced to

20   151 months and the amount that was distributed was only 3.7

21   grams of heroin.

22           THE COURT:  Yeah.  And normally I would say that's a

23   good discretion of that particular judge because normally I

24   would not go that far.

25           MR. ALMONTE:  I understand.  But I also wanted to

```
1    point out that there is legal support for maintaining the
2    career offender status in this particular case.
3              THE COURT:  That's one judge called it one way and,
4    you know, my problem -- we'll deal with that issue -- we'll
5    deal with whether I determine him to be a career offender.  And
6    let me hear again from the defense and then I will have to tell
7    you what I think.
8              MR. ALMONTE:  Thank you, your Honor.
9              THE COURT:  I'm talking only about this issue of -- do
10   you wish to respond?
11             MR. GILBERTI:  Just, you hit the nail on the head
12   on -- I'm sorry -- on the McCleve case and the cases he cited,
13   you're right, your Honor, those both came from the same Court
14   of Appeals judge.  Neither one of them is precedential --
15             THE COURT:  That's not the point.  We're dealing with
16   real life.
17             MR. GILBERTI:  I understand.
18             THE COURT:  All I said is that one judge called what
19   he had in front of him differently, and that doesn't mean that
20   he or she was wrong or incorrect, or right.  It just means that
21   that's what that person did.  And like I said, that's the
22   difference between half full and half -- it's not a
23   difference -- half full and half empty.
24             I'll tell you what my main problem with this case is
25   as far as you are concerned:  Whether the amounts are
```

WALTER J. PERELLI, C.S.R., OFFICIAL COURT REPORTER, NEWARK, NJ

1    insignificant or not, according to you, is a secondary issue.

2            You know what is significant to me?  That over a

3    period of 10 years he dealt with drug traffic within a thousand

4    feet of school property, and that seemed to be his hallmark in

5    trade.  And I'd be a fool if I didn't say that that didn't

6    impress me, because he is providing opportunity for persons

7    well under adult age to be exposed to drug traffic.

8            MR. GILBERTI:  May I answer that?

9            THE COURT:  You may.  You may respond to it.  You

10   don't answer it, you may respond to it.

11           MR. GILBERTI:  Yes.

12           THE COURT:  And as I said to you before, the

13   drug-trafficking has decimated too much of our society, both

14   here and in Jersey City and throughout this state and

15   throughout other states and other countries.  So the point is,

16   drug traffic is a contagion, as I said before.  And one who

17   willingly does it in this situation is doing it out of

18   basically two reasons:  One, he needs to support his own habit;

19   and/or greed.

20           But go ahead, respond.  What do you have to say?

21           MR. GILBERTI:  No.  Your Honor, having been on the

22   defense side for a number of years it's hard in a place like

23   Jersey City not to be charged with dealing, if you're dealing.

24   And again, I'm not saying it's good to be dealing.  But it's --

25   it would be -- I would hazard to say you probably can't find an

1    area that's not a hundred feet -- a thousand feet from a school

2    in Jersey City, and a lot of times prosecutors use that to up

3    the ante to leverage pleas.

4         So I understand your concern, and I understand the

5    purpose of the law.  The purpose of the law was a shield; it

6    was to protect kids in school, to keep them from having -- from

7    people from preying on them and dealing with a school.  But

8    over the years it's become a sword the prosecutors have used.

9    They've manipulated transactions or in some places, as I said

10   in Jersey City, you probably can't be more than a thousand feet

11   from a school.  So I think --

12        THE COURT:  As you reminded me, you know, that coming

13   from you is hearsay, isn't it?

14        MR. GILBERTI:  Absolutely, your Honor.

15        THE COURT:  All right.

16        MR. GILBERTI:  But so was your observation.

17        (Laughter.)

18        MR. GILBERTI:  Anyway, your Honor, I understand.  I'm

19   not --

20        THE COURT:  The observation I made was just that I

21   conclude that the purpose of the law is to hopefully inhibit or

22   prevent drug traffic to those who are very susceptible to such

23   traffic because they are of young age, and those are school

24   children going to and from school.

25        MR. GILBERTI:  I understand.  But I made my comments

```
1    to it.  Thank you.

2             THE COURT:  Okay.  As far as I'm concerned, based upon

3    the circumstances of these offenses occurred in the space of 10

4    years involving the specific thrust of drug-trafficking within

5    a thousand feet of school property and in amounts that -- --

6    whether they be called "insignificant" by any others, by one's

7    definition, they are significant as far as I'm concerned in the

8    fact that they cause danger and damage and possibly death to

9    those who willingly or unwillingly participate, and it shows a

10   history which is that of repetition.  As far as I'm concerned,

11   that's career -- that affords him career offender status, and

12   the calculation is 31 with a Criminal History of VI.  As far as

13   I'm concerned, he is a career offender in the context of

14   drug-trafficking.

15            All right.  That said, I'll hear from you again before

16   I sentence him.

17            MR. GILBERT:  Well, against that backdrop, your Honor,

18   you ought to sentence him at the bottom end of the guideline

19   range --

20            THE COURT:  I intend to.

21            MR. GILBERTI:  -- because I think you've hurt him

22   enough at this point.

23            THE COURT:  No, no, no, you misunderstood that.  I

24   have not hurt him; he has hurt himself.

25            MR. GILBERTI:  I understand.
```

1      THE COURT:  When he looks in the mirror he'll find
2   someone he can complain about.  You know, he doesn't complain
3   about Walls or anybody, he or the prosecutor or the Government,
4   he complains about who he sees in that mirror.
5      MR. GILBERTI:  I understand.  I wasn't commenting on
6   your --
7      THE COURT:  Unless he's in denial.
8      MR. GILBERTI:  I was commenting on your intent, I was
9   commenting on the result, that the damage was enough.  But we'd
10  ask that he be, for all the reasons set forth in the letters
11  and everything else, he be sentenced at the bottom end of the
12  guidelines.
13     THE COURT:  And I said I would do that.
14     Does your client wish to be heard?
15     I'll hear from you.
16     MR. GILBERTI:  Do you want to say something?
17     THE DEFENDANT:  State my name?
18     MR. GILBERTI:  No.  You can just tell him what you
19  want to say.
20     THE DEFENDANT:  I want to apologize to the Court for
21  my actions.  I want to apologize to my family.
22     First of all, your Honor, I want to let you know that
23  I'm accepting responsibility to my actions that I did things
24  that I did in my life.  I know they wasn't right.  I did them.
25  I'm here to accept responsibility for them.  Once again, I

1    apologize to the Court and my family.  I'm sorry I had my

2    family come all the way from South Carolina for a day such as

3    this.

4         THE COURT:  My concern is -- and I appreciate what

5    you're telling me now -- my concern is that, as I've pointed

6    out I believe almost repeatedly to your attorney, that in the

7    course of your criminal history, you were given numerous

8    opportunities for rehabilitation and all of them ended up with

9    probation being revoked for the most part, unless I have

10   overstated it.  I don't think I did.  And that's what bothers

11   me about you in this; is that you were given so many

12   opportunities.  You know, you're age 40 now, but long before

13   that you were out of Pampers.  You were not a child.  That's

14   why I told the attorney, I was not dealing with your juvenile

15   history.  In fairness to you, I was not dealing with your

16   juvenile history which he wanted me to consider.  I did not

17   consider that.  I'm considering your adult history.

18        So tell me about that in the context, why did you blow

19   those chances?

20        THE DEFENDANT:  Yes, I wanted to speak on that.

21        Your Honor, really, I really didn't blow those

22   chances.  I was forced out of those chances.  When the judge in

23   Jersey City gave me a special probation and a long-term drug

24   probation, I attended to that program.  I was there at

25   Integrity House.  There's records that show you I as there.  I

1    had a counselor.  Her name was Amotalab Mahaney (phonetic).  I

2    don't know what was her reasons, but if you go back deep into

3    the records, it was stated that the way she was attacking me

4    was from -- she revealed her hand and told me that when I

5    entered the drug program that I was to be watched.  So when she

6    told me that, I found out who was supposed to told her who I

7    was watched by, and it was supposed to be from the prosecutor.

8         So once I found out that, I had got -- I wrote a

9    letter to the Ethic Committee in Washington D.C.  So when they

10   came, they came to Jersey City, the court, on my behalf.  I

11   wasn't -- my opportunities to go back to the program was --

12   that's what I wanted to do, but I was forced out by her.

13        THE COURT:  I know.  But, good buddy, we're not

14   talking about the program.  We're talking about your later

15   commission of crimes.  You know, that you had some problems

16   with that person in Integrity House is not what I was talking

17   about.  I'm talking about the fact that you were given

18   opportunity to rehabilitate yourself.  The next thing you know

19   you're back in court.  That's what I'm talking about.  Follow

20   what I'm saying?

21        THE DEFENDANT:  Yes.

22        THE COURT:  That's what I'm talking about.  I'm not

23   talking about your experience at Integrity House or the fact

24   that somebody was out to get you there.

25        You're not claiming that she made you commit crimes,

```
1    are you?

2            THE DEFENDANT:  No.  I specified that because you said

3    I was given multiple times at probation.

4            THE COURT:  The point is, probation gives you an

5    opportunity to get your act together and start living hopefully

6    a normal legal life, that's what I meant by that.  Whether

7    you're in Integrity House or outside Integrity House, that's

8    what I mean by that.  That's what I meant by that.  That's what

9    I mean by it.  So I'm talking about that, you know, after you

10   were given probation, the next thing you know you're back in

11   court for another event, another circumstance.

12           Go ahead.

13           THE DEFENDANT:  Yes, you right.  I could admit that me

14   coming back-and-forth into the system, I had a problem as of my

15   own addiction, falling to certain things that I fell to, to

16   commit different crimes to come back into the system.  I tried.

17   I tried even before this case was up, before I caught this

18   case.

19           THE COURT:  All right.  Anything else you want to tell

20   me?

21           THE DEFENDANT:  I would hope that you be leniency

22   towards my sentence.  And once again, I want to thank the

23   Court.  I want to apologize to the Court and my family.

24           THE COURT:  All right.  Thank you.

25           THE DEFENDANT:  You're welcome.
```

```
1              THE COURT:  Thank you, sir.

2              Let me hear from the Government's representative.

3              MR. ALMONTE:  The Government doesn't have anything

4      else to add, it simply incorporates the March 6th, 2014 letter

5      that was addressed to your Honor.

6              THE COURT:  Mr. Jenkins, stand, please.

7              You are 40 years of age.  And before you reached that

8      age, well before you reached that age you have been involved in

9      criminal activity for the better part of your adult life.

10     You're here before me because you pled guilty to conspiring

11     planning to distribute, to sell and distribute PCP and heroin,

12     and that arose out of your having sold 11.8 grams of PCP and

13     89.6 grams of heroin to a confidential informant.  That's why

14     you're here precisely before me.

15             But as I said, we discussed your criminal history.  I

16     took time to place your entire adult criminal history on the

17     record so that it would be the background in order for me to

18     listen to arguments of counsel to determine whether you should

19     be a career offender.  And I found that based upon over a

20     period of time, substantial period of time, you have

21     inevitably, almost in a chronic situation, found fit to attempt

22     to or actually sell or distribute drugs within 1,000 feet of

23     school property, and they form the basis on at least three

24     occasions where you have been convicted of such crimes, and

25     they are felonies under our law, and they under a calculation
```

1    require me to determine that you are a career offender.

2          And I think realistically based on my analysis you are

3    a career offender.  As I said, you used the same spot.  Now,

4    your attorney argues, well, any spot within Jersey City is

5    within a thousand feet of school district.

6          Well, that really is of no moment.  The point is, you

7    were selling -- attempting to sell narcotics, as I've said

8    before, something that is destructive to too many people for me

9    to ignore that.  And the amounts are sufficient as far as I'm

10   concerned to be destructive to too many innocent people, people

11   who actually use those drugs, people who are relatives of

12   people who use them, people who are acquaintances.  We can

13   discuss the myriad ways in which drug activity and drug usage

14   has damaged, you know, our society, whether it be of one

15   race -- and it cuts across all races, so it's not a question of

16   our race, it's a question of the human race -- and it cuts cut

17   city boundaries and it cuts off state and national boundaries.

18   It is just destructive.  And for that, society, when it has the

19   opportunity to punish people who voluntarily engage in that

20   activity, should provide appropriate punishment.

21         So that is the underlying rationale for my determining

22   that you are a career offender and also the underlying

23   rationale for my imposing the sentence I'm about to impose upon

24   you.  You have to be punished so that it stings, and that is to

25   stop you and to punish you on behalf of society and hopefully

1    stop others from continuing down this path of drug-trafficking.

2         Those who think that you shouldn't be so punished for

3    such drug-trafficking are, respectfully, in a state of denial.

4    Because there's no question that drug-trafficking to me is as

5    onerous and dangerous as any other type of crime short of

6    deliberate immediate murder.

7         So we punish you in this way so that it stings, no

8    more than is necessary, but no less than is necessary because

9    it is of such importance to society.  I mean, there's no point

10   in repeating what I've said to all of you in our discussion of

11   your case this morning.  Drug-traffic is destructive.  This is

12   not a question of crack cocaine versus cocaine.  We're not

13   dealing with a situation where the sentences would be

14   disparate.  This is not that.  This is a question where we're

15   dealing with a person who willingly sold drugs over a period of

16   10 years, and I think the appropriate sentence is what I'm

17   about to say.

18        At the same time, even though the punishment should

19   sting, it doesn't mean that you will spend the rest of your

20   life in jail.  You have according to the mortality tables

21   probably at least 30 to 40, possibly 50 years, 50-plus years to

22   go unless something untoward happens.  Unless some accident

23   happens to you, unless some serious injury occurs to you, you

24   have half of your life ahead of you, and so hopefully you will

25   spend that time getting your act together.

1           But pursuant to the Sentencing Reform Act of 1984,

2     it's my judgment that you, Daniel Jenkins, are hereby committed

3     to the custody of the Bureau of Prisons to be imprisoned for a

4     term of 188 months.

5           Upon release from imprisonment, you are to be placed

6     on Supervised Release for a term of five years.  Within 72

7     hours of release of the custody of the Bureau of Prisons you

8     are to report in person to the probation office in the District

9     in which you are released.

10           Now, while you are on Supervised Release, you're not

11    to commit any other federal, state, or local crime; you may not

12    possess any firearm or any other dangerous device; you may not

13    possess any illegal controlled substances; and you are to

14    comply with the other standard conditions that have been

15    adopted by the Court.

16          I'm going to require that you submit to one drug test

17    within 15 days of the beginning of your period of Supervised

18    Release.

19          Now, you are to refrain from the illegal possession

20    and use of drugs, including prescription medication not

21    prescribed to, or in your name; and the use of alcohol; and you

22    are to submit to urinalysis or other forms of testing to ensure

23    compliance.

24          It is further ordered that you are to submit to

25    evaluation and treatment on an outpatient or in-patient basis

```
1    as approved by the United States Probation Office.  You are to
2    abide by the rules of any such program and remain in treatment
3    until you've satisfactorily discharged by the Court.
4           You don't have the ability to pay a fine; I so make
5    that determination, and I will waive the fine in this matter.
6    But you are ordered to pay to the Court a total special
7    assessment of $100.00, which is due immediately.
8           You have the right to appeal what I've done pursuant
9    to Section 3742 of Title 18 United States Code, and if you're
10   not able to pay you may request the Clerk of the Court to file
11   a Notice of Appeal on your behalf.
12          I recommend that the Bureau of Prisons designate a
13   facility for service of this sentence as near as possible to
14   your home address.
15          Anything else?
16          MR. GILBERTI:  Yes, your Honor.  We'd ask that you
17   recommend to the Bureau of Prisons --
18          THE COURT:  Come up.
19          MR. GILBERTI:  I'm sorry.
20          THE COURT:  You ask what?
21          MR. GILBERTI:  We ask that you recommend to the Bureau
22   of Prisons that he be assigned to the Residential Drug Abuse
23   Program, the 500-hour comprehensive program in the Bureau of
24   Prisons.  He needs a judge's recommendation to be --
25          THE COURT:  He has that recommendation.
```

```
1              MR. GILBERTI:  Thank you, your Honor.
2              THE COURT:  It's called what now?
3              MR. GILBERTI:  The Residential Drug Abuse Program.
4              THE COURT:  All right.  I so recommend.
5              UNIDENTFIED AUDIENCE MEMBER:  Jesus.
6              MR. GILBERTI:  And also -- and I am only doing this,
7      not to incur your wrath from earlier, but I've had situations
8      where the Bureau of Prisons has given me a hard time -- I would
9      ask you to give him credit on the record for the time he served
10     since September 12th of 2012.
11             THE COURT:  If he's been in federal custody since
12     September 12th did you say?
13             MR. GILBERTI:  Yes.
14             THE COURT:  Of 2013?
15             MR. GILBERTI:  2012.
16             THE COURT:  2012?
17             He's entitled to such --
18             UNIDENTFIED AUDIENCE MEMBER:  Oh God.  Oh, God.  Oh
19     Jesus.  God.  Oh Lord.  Jesus, Lord, help.  Oh, alleluia, help
20     me.
21             THE COURT:  He's entitled to such, and I give him
22     credit for it.
23             MR. GILBERTI:  Okay, thank you.  The only reason I
24     bring it up is I've had disputes with the Bureau of Prisons in
25     the past where it wasn't on the record.
```

```
1                    THE COURT:  No, I have no problem with that.  As I
2       say, if he's been in federal custody since September 12th of
3       2012, he's entitled to credit toward the sentence.
4                    MR. GILBERTI:  Thank you, your Honor.
5                    THE COURT:  That's practically two years.
6                    Anything further from anyone?
7                    MR. ALMONTE:  Nothing from the Government, your Honor.
8                    THE COURT:  All right.  So be it.
9                    He's been sentenced on a Level 31 with a Criminal
10      History of VI.
11                   MR. GILBERTI:  I think his family came a long distance
12      today.  Will they be able to see him downstairs in the bullpen
13      for about a --
14                   THE COURT:  I don't know, that's up to the marshals.
15      That's up to -- I doubt it.
16                   A MARSHAL:  No.  It's not allowed.
17                   THE COURT:  I'm sorry.
18                   (Conclusion of proceedings.)
19                                   ooOoo
20
21
22
23
24
25
```